**UNITED STATES of America**

**v.**

**Robert GUERRERIO, Sr., Rosalie Guerrerio, Robert Guerrerio, Jr., John Guerrerio and Edward Lustig, Defendants.**

**No. 86 Cr. 1061 (DNE).**

United States District Court,
S.D. New York.

Dec. 8, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (William B. Pollard, III, Asst. U.S. Atty., of counsel), for U.S.

Milbank, Tweed, Hadley & McCloy, New York City (Thomas Puccio, of counsel), for defendant Robert Guerrerio, Sr.

Stroock, Stroock & Lavan, New York City (Joel Cohen, of counsel), for defendant Rosalie Guerrerio.

Schlam, Stone & Dolan, New York City (Harvey M. Stone, of counsel), for defendant Robert Guerrerio, Jr.

Gerald J. McMahon, New York City, for defendant John Guerrerio.

Freeman, Nooter & Ginsberg, New York City (Louis M. Freeman, of counsel), for defendant Edward Lustig.

## OPINION AND ORDER

EDELSTEIN, District Judge:

The defendants move for suppression, under the court's supervisory power, of statements made by defendants Edward Lustig and Robert Guerrerio Jr. to Dominic DeFebo. Defendants assert that suppression is necessary because the Assistant United States Attorney ("AUSA") assigned to the case violated DR 7–104(A)(1) of the

Code of Professional Responsibility as adopted by the New York State Bar Association. As a full statement of the background of this case is set forth in the court's previous opinion, dated October 13, 1987, *United States v. Guerrerio,* 670 F.Supp. 1215 (S.D.N.Y.1987), only the facts relevant to the instant motion are set forth herein.

## FACTS

This case arises out of a fifteen count indictment that alleges a tax fraud conspiracy by the defendants. It is alleged that the defendants laundered money by a series of transactions between the Guerrerio's corporation, Rey Caulking, Inc. ("Rey Caulking") and two shell corporations, Ajax Caulking and Empire Caulking.[1] On July 1, 1985, defendant Edward Lustig, who was then a subject of the grand jury investigation that resulted in the instant indictment, met with Dominic DeFebo, a cooperating witness. The government secretly recorded the content of that meeting. Defendants have moved to exclude statements made by Edward Lustig to Dominic DeFebo at that meeting.

In late May or early June 1985 during the course of the grand jury's investigation, Internal Revenue Service ("IRS") agents suggested to the AUSA assigned to the case that DeFebo, equipped with a secret wire, should be sent to meet with Lustig to discuss and record matters relevant to the grand jury's investigation. After reviewing the proposal for ten days, the AUSA agreed to the plan.

At about the same time, Lustig was served with a grand jury subpoena to produce Ajax Caulking's records. Although Lustig was granted several adjournments of his grand jury appearance, he appeared at the United States Attorney's office on June 13, 1985 to produce some invoices Ajax had sent to Rey Caulking. At that meeting, Lustig indicated he was attempting to secure counsel, Mr. Robert Ellis, Esq., who in fact later represented Lustig

---

1. Empire was allegedly operated by Dominic DeFebo, under the name of Donald Duzant.

Ajax was owned and operated by defendant Lustig.

when he appeared before the grand jury on July 1, 1985.

During the evening of July 1, 1985, De-Febo went to the home of Lustig's estranged wife, where Lustig was visiting, and met with Lustig. The two men apparently went for a walk and the conversation that is the subject of this motion ensued. Pursuant to the plan agreed upon by the I.R.S. agents and the AUSA, the following day, DeFebo met with Robert Guerrerio Jr. to arrange a meeting with Robert Guerrerio Sr. At the time of the recordings, all the Guerrerio defendants were represented by counsel and the AUSA was aware of such representation.[2]

By the present motion, Lustig seeks to have the tape recording of his July 1 conversation with DeFebo excluded from evidence. The Guerrerio defendants also join the motion and further move for exclusion of the recording of Robert Guerrerio Jr.'s conversation with DeFebo of July 2.[3] The defendants allege that the AUSA violated DR 7–104(A)(1) because IRS agents recorded the conversations at issue with his knowledge. Defendants conclude that such an ethical violation requires exclusion.

The court disagrees and accordingly the motion is denied.[4]

## A. Exclusion is not an appropriate remedy

Exclusion is a powerful remedy. It causes otherwise credible, and usually persuasive, evidence not to be considered by a jury. The result of excluding evidence is often that a factually culpable defendant goes unpunished. As Judge Cardozo stated the rule, "The criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587, *cert. denied*, 270 U.S. 657, 46 S.Ct. 354, 70 L.Ed. 784 (1926).

Nevertheless, the exclusionary rule has been applied in cases of constitutional violations by law enforcement personnel.[5] Although the exclusionary rule is most commonly applied to evidence seized in violation of the Fourth Amendment to the Constitution, it is also applicable to violations of the Fifth and Sixth Amendments.

In the case at hand, however, the defendants allege violations by the prosecutor of ethical rules, specifically of DR 7–104(A)(1), as the basis for suppression. DR 7–104(A)(1)[6] prohibits direct communication

---

**2.** The government has questioned whether Lustig was in fact represented by counsel at the time of the recorded conversation. DR 7–104(A)(1) applies only when a party is represented by counsel. Whereas the court would decline to suppress the statement whether or not Lustig was indeed represented, this court need not reach this issue.

**3.** The government concedes that if Lustig's motion is granted then the recording of Robert Jr. should also be suppressed on the same ground. Accordingly, the parties only addressed the Lustig motion in their moving papers.

The government contends that of the five moving defendants, only Lustig has standing to seek suppression. As the relief sought is denied, this court sees no reason to address the issue of standing.

**4.** The defendants' motion was denied in an order dated November 12, 1987. The instant opinion memorializes the court's reasoning in reaching that decision. The court expeditiously issued the November 12, order so that the parties might most effectively prepare for trial.

**5.** The Supreme Court in the past has stated that the exclusionary rule is "part and parcel of the Fourth Amendment's limitation upon [govern-

mental] encroachment of individual privacy," and "an essential part of both the Fourth and Fourteenth Amendments." *Mapp v. Ohio*, 367 U.S. 643, 657, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961). More recently, however, the Court has increasingly focused on the deterrent purpose of the rule, thus characterizing the rule as a "judicially-created remedy" rather than a natural consequence of the Fourth Amendment. *See United States v. Calandra*, 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974). As this issue is not raised by the present motion the court need not address it. The court nevertheless notes that the rule would appear to be constitutionally-based whether it is viewed as judicially-created or "part and parcel" of the constitution because one is no less constitutional law than the other. *See generally* W. LaFave, Search and Seizure § 1.1(f) (2d ed. 1987)

**6.** DR 7–104(A)(1) of the Code of Professional Responsibility as adopted by the New York State Bar Association reads:

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior

by an attorney with a party he knows to be represented by counsel. A violation of attorney disciplinary rules is not of constitutional magnitude and consequently suppression is not constitutionally required. If the evidence in issue is to be excluded at all, it must be excluded pursuant to the court's general supervisory power.

In support of the motion to suppress, the defendants cite the case of *United States v. Hammad,* —— F.Supp. ——, No. Cr–87–232 (E.D.N.Y. September 21, 1987) (mem.). In that case, the district court suppressed certain statements made by the criminal defendant to a business acquaintance that was cooperating with the government. That conversation was recorded by a government agent. The court concluded that the cooperating witness was the alter ego of the prosecutor and the conversation constituted a violation of DR 7–104(A)(1). Finding an ethical breach, the court suppressed the statements in question.

The *Hammad* court seems to have assumed that suppression is a natural consequence of a violation of DR 7–104(A)(1). As noted in *Hammad,* the leading Second Circuit decision on a prosecutor's violation of DR 7–104(A)(1), *United States v. Jamil,* 707 F.2d 638 (2d Cir.1983), did not need to decide "whether DR 7–104(A)(1) would have been violated in this context if the investigator *had* been acting as the prosecutor's alter ego or to decide whether suppression would have been warranted *if* the disciplinary rule had been violated." *Id.* at 646 (emphasis in original). After discussing the elements of the ethical violation, the *Hammad* court decided that an ethical violation had been committed. It then summarily concluded that suppression should result.

 Although suppression necessarily results from a constitutional violation,[7] the same result is not a foregone conclusion in the case of an ethical violation by a prosecutor. This court finds that an ethical violation does not compel suppression and moreover, suppression is inappropriate.

It would appear that no federal court has directly addressed the question of whether suppression is compelled or appropriate in the case of a violation of DR 7–104(A)(1). *But see Tabbi v. Town of Tanawanda,* 111 Misc.2d 641, 444 N.Y.S.2d 560 (Erie Cty. Sup.Ct.1981) (suppression not appropriate remedy for Disciplinary Rule violation). Although there are a number of federal appellate decisions that have addressed the question of ethical violations by federal prosecutors, these cases do not reach the question of the propriety of suppression by holding that there was no ethical violation. *See United States v. Sutton,* 801 F.2d 1346 (D.C.Cir.1986); *United States v. Fitterer,* 710 F.2d 1328 (8th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *United States v. Dobbs,* 711 F.2d 84 (8th Cir.1983); *United States v. Kenny,* 645 F.2d 1323 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Lemonakis,* 485 F.2d 941 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). This court believes that speculation as to the ethical propriety of a prosecutor's actions is not required to decide such a suppression motion because suppression is an inappropriate remedy.

The exclusionary rule has been the subject of much controversy, even in the context of constitutional violations. *See e.g.* MacDougall, *The Exclusionary Rule and its Alternatives: Remedies for Constitutional Violations in Canada and the United States,* 76 J.Crim.L. & Criminology 608 (1985); Posner, *Excessive Sanctions for Governmental Misconduct in Crimi-*

---

consent of the lawyer representing such other party or is authorized by law to do so.

7. Even in the constitutional arena, suppression is not always appropriate. For example, when a police officer acts in good faith reliance upon a warrant later found not to be based on probable cause, suppression is not available. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Supreme Court in that case found that the minimal added deterrent effect provided by exclusion at that point did not justify the costs of exclusion.

In addition, the Supreme Court has also held, based on similar reasoning, that Fourth Amendment violations may not be reviewed on petition for a writ of habeas corpus. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

*nal Law,* 57 Wash.L.Rev. 635 (1982). The Supreme Court, in recent years, has dwelled on the severe costs the exclusionary rule imposes on society.[8] *See e.g. United States v. Leon,* 468 U.S. 897, 907, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984); *Stone v. Powell,* 428 U.S. 465, 489–96, 96 S.Ct. 3037, 3050–53, 49 L.Ed.2d 1067 (1976). Notwithstanding such costs, the exclusionary rule has been consistently applied in cases of constitutional violations. The primary purpose of the exclusionary rule is deterrence. *United States v. Leon,* 468 U.S. 897, 908–09, 104 S.Ct. 3405, 3412–13, 82 L.Ed.2d 677 (1984); *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). The rule encourages systemic observance of the substantive rights that exclusion seeks to protect. *See Dunaway v. New York,* 442 U.S. 200, 220–21, 99 S.Ct. 2248, 2260–61, 60 L.Ed.2d 824 (1979) (Stevens, J. concurring) ("The justification for the exclusion of evidence obtained by improper methods is to motivate the law enforcement profession as a whole—not the aberrant individual officer"). The rule is not intended to punish but rather it seeks to create an "incentive to err on the side of constitutional behavior." *United States v. Johnson,* 457 U.S. 537, 561, 102 S.Ct. 2579, 2593, 73 L.Ed.2d 202 (1982).

The exclusionary rule is necessary to deter unconstitutional behavior by actors in the criminal justice system because individual punishment is impractical. Often law enforcement officers, magistrates, prosecutors, and other government agents are immune from monetary damages. Further, individualized punitive measures would be unjust. The benefit of unconstitutional law enforcement tactics, if it can be said that there is any benefit, does not accrue to the individual violator. Rather, any benefit accrues to society by facilitating the conviction of factually culpable defendants.[9] Accordingly, it is equitable that the costs of upholding constitutional rights should be borne by society in the form of lost convictions.

It is also true that there may be no other effective remedy for violations of the Fourth, Fifth, and Sixth Amendments in the criminal context. *See Mapp v. Ohio, supra,* 367 U.S. at 652, 81 S.Ct. at 1690 ("other remedies have been worthless and futile"). As noted above, money damages are often not recoverable as a result of the web of privileges and immunities accorded to the actors in the criminal justice system. It follows then that the exclusionary rule is required in the constitutional context because without a remedy, the right is but an empty promise.

■ In considering the propriety of applying the exclusionary rule to violations of DR 7–104(A)(1), the court first notes that

---

**8.** It is argued by some commentators that many of the costs attributed to the exclusionary rule are in fact costs imposed by the substantive constitutional guarantees underlying the rule. *See e.g.* W. LaFave, Search and Seizure § 1.3(c); Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search and Seizure Cases,* 83 Colum.L.Rev. 1365, 1392–33 (1983). Of course such a distinction is inapposite in this context since exclusion has never been accepted as "part and parcel" of DR 7–104(A)(1) in the way the exclusionary rule has been viewed as one with the Fourth Amendment for example. *See Mapp v. Ohio,* 367 U.S. 643, 656–67, 81 S.Ct. 1684, 1692–98, 6 L.Ed.2d 1081 (1961). Consequently, the court must independently evaluate the propriety of the exclusionary rule as a remedy for violation of DR 7–104(A)(1). In addition, the Supreme Court has recently stated expressly that the question of whether to apply the exclusionary rule is separate from the question whether a substantive violation has occurred.

*See United States v. Leon,* 468 U.S. 897, 906–07, 104 S.Ct. 3405, 3411–12, 82 L.Ed.2d 677 (1984). The Court further stated that a cost/benefit analysis is the appropriate test of whether exclusion is warranted in a particular case. *See id.*

Regardless of the doctrinal basis of the exclusionary rule, its costs to society are clear. The rule diverts the court's attention from its appropriate cynosure, the ultimate determination of the issue of guilt or nonguilt. Furthermore, the evidence sought to be excluded is often particularly probative and reliable. Thus, even a minor error by the police may allow a guilty defendant to walk free. Such disproportionality is abhorrent to the concept of justice and may erode the public's faith and confidence in the criminal justice system. *See Stone v. Powell,* 428 U.S. 465, 489–96, 96 S.Ct. 3037, 3050–53, 49 L.Ed.2d 1067 (1976).

**9.** The exclusionary rule, however, is not without benefit to society. The rule protects everyone's rights by encouraging lawful police conduct.

the exclusionary rule is by no means an inherent part of the Disciplinary Rule. Thus the rule should only be applied if it is necessary to further the underlying goal of deterring unethical behavior. Weighing the costs and benefits of applying the exclusionary rule to cases of violations of DR 7–104(A)(1) by a prosecutor, the court finds that application of the rule is not warranted.

First, the disciplinary rule applies only to attorneys, in this case, the government prosecutor.[10] Conversely, the constitutional proscriptions generally enforced by the exclusionary rule apply to all state actors, including law enforcement officers and magistrates as well as prosecutors. As a result, when applied in cases of constitutional violations, the exclusionary rule creates pressure within the system not to violate the constitutional rights sought to be protected. Applying the rule in the case at bar will create no such pressure because only the prosecutor is governed by the Disciplinary Rule.

The practical result of exclusion may ironically be to promote rather than inhibit the type of investigative tactics complained of herein. If exclusion automatically results from every communication between government informants and defendants who have retained counsel with respect to an investigation, then investigative personnel may be tempted not to inform the AUSA in charge of the case prior to conducting such eavesdropping. Consequently, keeping the AUSA uninformed about such investigations will, far from enforcing the principles underlying DR 7–104(A)(1), reduce the number of situations to which the Disciplinary Rule applies.

Moreover, the rights of a criminal defendant, or in this case a potential criminal defendant, are more likely to be preserved by a prosecutor than by investigative personnel. This view is not a reflection of investigative officers as individuals. Rather, because they are engaged in the "competitive enterprise of ferreting out crime," *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), their role in the criminal justice system is less conducive to the protection of individual rights.[11] *Cf. Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986). In contrast, a prosecutor serves a dual duty. His obligation is not merely to secure a conviction; he must also see that justice is done. *Polo Fashions, Inc. v. Stock Buyers International, Inc.*, 760 F.2d 698, 704–05 (6th Cir.1985), *cert. denied,* — U.S. ——, 107 S.Ct. 2480, 96 L.Ed.2d 373 (1987); Model Code of Professional Responsibility EC 7–13. Thus, a prosecutor is better suited to the task of guaranteeing that the subject of a criminal investigation in not denied his rights. This court is hesitant to fashion a rule that would effectively remove this safeguard.

A second reason militating against applying the exclusionary rule in cases of ethical violations by a prosecutor is that the disciplinary rule is adequately enforced by alternative sanctions. The discipline of attorneys has traditionally been a matter uniquely the province of local authorities. The New York Bar has established a sophisticated system to review and disciple attorneys for violations of the Code of Professional Responsibility as adopted by the New York Bar Association. This system is primarily responsible for the policing of attorney misconduct. Failure to apply the exclusionary rule to such cases will not leave violations of the Disciplinary Rule unremedied. Consequently, the exclusionary rule need not apply to Disciplinary Rule violations because "other remedies

---

**10.** It is now clear that DR 7–104(A)(1) applies to criminal prosecutors, even though the rule may have been drafted with civil litigation as its primary object. *See United States v. Jamil*, 707 F.2d 638, 645 (2d Cir.1983).

**11.** This notion also underlies the requirement that search warrants and arrest warrants be issued by an *impartial* third party such as a magistrate. The implicit assumption is that police officers, due to their personal involvement, may not be able to render a truly detached and impartial decision on whether a set of facts constitutes probable cause. *See Connally v. Georgia*, 429 U.S. 245, 250–51, 97 S.Ct. 546, 548–49, 50 L.Ed.2d 444 (1977) (per curiam); *Ward v. Village of Monroeville*, 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972).

have been worthless." *Mapp v. Ohio,* 367 U.S. 643, 652, 81 S.Ct. 1684, 1690, 6 L.Ed.2d 1081 (1960).

In sum, the costs of excluding evidence obtained in violation of DR 7–104(A)(1) are the same as applying the exclusionary rule in cases of constitutional violations, namely, that reliable and probative evidence of a crime cannot be considered at trial. Further, in both cases, the court's attention is diverted from determining guilt or non-guilt, and factually culpable defendants may escape justice. Nevertheless, the same justifications for applying the exclusionary rule to constitutional violations— systemic deterrence, lack of alternative remedies, the vital importance attached to constitutional rights—do not apply in the case of Disciplinary Rule violation. As a result, the court finds that a violation of DR 7–104(A)(1) by a prosecutor does not justify suppression. Accordingly, the court denies the defendants' motion to suppress.

B. Alleged Violation of DR 7–104(A)(1)

Although the court has denied relief on the ground that the relief requested is inappropriate in such cases, the court also believes that the conduct of the prosecutor in this case would not, in any event, constitute a violation of DR 7–104(A)(1). The issue of whether conduct such as that alleged by the defendants is a breach of DR 7–104(A)(1) is yet to be resolved in this circuit. *United States v. Jamil,* 707 F.2d 638, 646 (2d Cir.1983). The Second Circuit, however, has addressed this issue in dictum. In *United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982) (per curiam), the Court of Appeals stated that it was "doubtful" that DR 7–104(A)(1) would apply to an undercover recording made prior to the commencement of a formal prosecution. If the Disciplinary Rule was indeed applicable in such a situation, the Court observed, it would "simply enable suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations." *Id.*[12]

Each federal circuit addressing this issue has indicated that DR 7–104(A)(1) would not apply in the investigatory phase of a criminal case. *See United States v. Sutton,* 801 F.2d 1346, 1366 (D.C.Cir.1986) (Disciplinary Rule inapplicable to recording made prior to formal initiation of criminal proceedings); *United States v. Fitterer,* 710 F.2d 1328, 1331 (8th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983) ("We do not believe that DR 7–104(A)(1) of the Code of Professional Responsibility was intended to stymie undercover investigations when the subject retains counsel); *United States v. Dobbs,* 711 F.2d 84, 86 (8th Cir.1983) ("Noncustodial interview ... prior to initiation of judicial proceedings ... did not constitute an ethical breach"); *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981) (recording made in "non-custodial environment, prior to [defendant's] charge, arrest, or indictment ... does not implicate the sort of ethical problems addressed by the Code"); *United States v. Lemonakis,* 485 F.2d 941, 955–56 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974) (indicating that DR 7–104(A)(1) would not apply in a non-custodial situation).

Those courts that have found DR 7–104(A)(1) inapplicable to the investigatory stage of a criminal prosecution have not clearly stated the bases for those decisions.[13] A pattern in those cases, however,

---

**12.** The persuasive affect of the *Vasquez* decision is unclear. The *Vasquez* appeal was originally decided by a summary order dated January 21, 1982. Under the local rules of the Second Circuit, a summary order has no precedential value. On the urging of the Office of the United States Attorney, however, the Appellate Court repeated the substance of the order of January 21, 1982 in a per curiam opinion. In doing so, the Court indicated that it took that action so that the decision might be "relied upon in other similar cases." *United States v. Vasquez,* 675 F.2d 16, 17 n. * (2d Cir.1982) (per curiam).

**13.** Those courts finding DR 7–104(A)(1) inapplicable to the investigatory stages of a criminal prosecution have not failed to address the practical consequences of holding to the contrary. Such a holding would allow a criminal to make himself immune from undercover recordings supervised by a prosecutor. *See United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982) (per curiam) (dictum). In *United States v. Hammad,* —— F.Supp. ——, No. Cr.–87–232 (E.D.N.Y. September 21, 1987) (mem.), the court held that DR 7–104(A)(1) was indeed applicable to the investigatory phase of a criminal case. In so ruling,

is readily apparent. DR 7–104(A)(1) is often considered in conjunction with the Sixth Amendment right to counsel. *See United States v. Jamil,* 546 F.Supp. 646, 655–54 (E.D.N.Y.1982), *rev'd,* 707 F.2d 638 (2d Cir. 1983) (collecting cases). To a large extent, the Disciplinary Rule and the Sixth Amendment serve a common purpose. DR 7–104(A)(1) is designed, at least in part,[14] to guarantee balance and fairness in our adversarial system of justice. *United States v. Lemonakis,* 485 F.2d 941, 956 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). The prohibition on direct contact with a represented party is required by the perceived imbalance of legal skill and acumen between an attorney and a layman. *See Massiah v. United States,* 377 U.S. 201, 211, 84 S.Ct. 1199, 1205, 12 L.Ed.2d 246 (1964) (White, J., dissenting). Without such a rule, an unscrupulous attorney might unfairly take advantage of an unsophisticated party.

In the context of a criminal prosecution, the Sixth Amendment right to counsel evinces a similar concern with guaranteeing fairness in an adversarial system of justice. The right allows some fairness in a proceeding in which the power of the state is brought against an often unsophisticated individual.

Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he may have a perfect one. He requires the guiding hand of counsel.

*Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932); *see United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984).

The scope of DR 7–104(A)(1) in criminal cases is currently a topic of legal debate. The scope of the Sixth Amendment right to counsel, however, is a well defined area of the law. As the Disciplinary Rule and the right to counsel share a common purpose, this court looks, by analogy, to the limitations on the right to counsel to determine the applicability of DR 7–104(A)(1) to the facts of the instant case.

It is clear that at the time of the recordings in question, the Sixth Amendment right to counsel was yet to attach. *See United States v. Sutton,* 801 F.2d 1346, 1365 (D.C.Cir.1986). The right comes into play only after the commencement of adversarial judicial criminal proceedings such as a formal charge, preliminary hearing, indictment, information, or arraignment. *See United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d

the court stated that it did not foresee undue limitations on criminal investigations. The court's reasoning was that as its holding was limited to cases "in which a suspect has retained counsel specifically for representation in conjunction with the criminal matter in which he is held suspect, and the government has knowledge of that fact ... this rule would not apply to the vast majority of undercover investigations where the suspects are unaware of any investigation." *Id.* at 8.

Even with the limitation espoused in *Hammad,* this court can readily imagine situations in which an expansive reading of DR 7–104(A)(1) could unduly prejudice the government's efforts to control crime. For example, a sophisticated racketeer might retain counsel in regard to the operation of his criminal enterprise. Thereafter, he might publicly advise law enforcement agencies that any future inquiries regarding his business activities must be made through his attorney. By doing so, the racketeer would effectively stymie any efforts by the government to use undercover agents to participate in, and record, inculpatory conversations. Granted, no such subterfuge would be used in the majority of cases. Nevertheless, this scenario is a possibility in those investigations concerning organized crime. Thus, the government would be deprived of a potent weapon in its arsenal against the infiltration of crime into all aspects of society.

**14.** DR 7–104(A)(1) also serves to preserve the integrity of the attorney/client relationship. *See* Comment, Model Rules of Professional Conduct, Rule 4.2 (proposed final draft) (equivalent of DR 7–104(A)(1)). However, in the criminal context, both of these concerns tend to be subsumed by Sixth Amendment concerns.

146 (1984). This limitation on the protection of the right to counsel finds its rationale in the fact that the adversarial relationship between the government and the defendant coalesces only following the formal initiation of a prosecution. It is only at that point that the government truly commits itself to the case and the defendant finds himself immersed in the intricacies of substantive and procedural criminal law. *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972).

Similarly, it is only at the formal initiation of a prosecution that the protection of DR 7–104(A)(1) should attach. Like the right to counsel, the Disciplinary Rule is calculated to lend balance to an adversarial relationship. In the context of a criminal prosecution, however, an adversarial relationship does not exist at the investigatory phase of a case. *See Kirby, supra*, 406 U.S. at 689, 92 S.Ct. at 1882. Given the societal cost of a premature application of the Disciplinary Rule, *see supra*, note 8, DR 7–104(A)(1) should not be read to embrace those proceedings occurring prior to the attachment of the right to counsel.

Such an interpretation of DR 7–104(A)(1) is consonant with the language of the Rule. DR 7–104(A)(1) only proscribes communications on the "subject of [the] representation" by counsel. In light of the broad discretion accorded to prosecutors, prior to the formal initiation of the prosecution, the ultimate nature of the case may be unclear. For example, in the instant case, Lustig is charged with obstruction of justice. The alleged obstruction, however, only arose at the time of Lustig's conversation with De-Febo.[15] As a criminal case is nebulous until the time of the formal initiation of the prosecution, it will often be impossible to determine whether an investigation is on the subject of a suspect's representation by counsel. Further, the subject of representation is often defined by the criminal charges ultimately brought against a defendant. Thus, the language of the Disciplinary Rule may be rendered devoid of meaning and the scope of the Rule's protection made unascertainable by applying the Rule during the investigatory phase of a criminal case.

Furthermore, the Disciplinary Rule only prohibits communications with a "party" known to be represented by an attorney. The term "party" is a technical term having a particular meaning in legal parlance. "Party" refers to "those by or against whom a legal suit is brought ... all others who may be affected by the suit ... are persons interested but not parties." Black's Law Dictionary, 5th ed. (1979); *see Golatte v. Mathews*, 394 F.Supp. 1203, 1207 & n. 5 (M.D.Ala.1975). A basic principle of statutory construction calls for observance of the plain meaning of a statute's language. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); 2A Sutherland Statutory Construction § 46.01 (N. Singer, 4th ed. 1984). At the time of the communications in question, neither of the declarants was a party to a prosecution. Thus, according to its plain meaning, DR 7–104(A)(1) would apparently not apply in the instant case.[16]

Accordingly, this court believes that DR 7–104(A)(1) does not apply to the conversations in question in the instant case. Thus, the court feels there is no obligation or need to take further action regarding the conduct of the AUSA.[17]

---

15. During his conversation with DeFebo, Lustig counseled DeFebo not to produce certain documents for a federal grand jury. This act is the basis for the obstruction of justice count in the instant indictment.

16. In civil contexts, however, it has been found that DR 7–104(A)(1) does apply before the formal initiation of a law suit. *See e.g.* NYCA Comm. on Professional Ethics, Opinions No. 302 (1934); *id.* No. 101 (1928); *see also United States v. Jamil*, 546 F.Supp. 646, 653–54 (1982), *rev'd*, 707 F.2d 638 (2d Cir.1983) (dictum in criminal case that term "represented party" encompasses potential litigants); *In re FMC Corp.*, 430 F.Supp. 1108 (S.D.W.Va.1977) (court using supervisory power rather than DR7–104(A)(1) to regulate government's contacts with employees of a corporation subject to grand jury investigation).

17. Canon 3B(3) of the Code of Judicial Conduct provides that a "Judge should take or initiate appropriate disciplinary measures against a ... lawyer for unprofessional conduct of which the judge may become aware."

### Conclusion

The court finds that exclusionion of evidence is not an appropriate remedy for a violation of DR 7–104(A)(1) and denies the defendants' motion to suppress. Further, as the court believes that the Disciplinary Rule is inapposite to the investigatory phase of a criminal case, the court also believes that the instant case involves no breach of ethical duties on the part of the AUSA.

SO ORDERED.