POLYCAST TECHNOLOGY CORPORATION, Plaintiff,

v.

UNIROYAL, INC., CDU Holding, Inc., Joseph P. Flannery, John R. Graham, Alexander R. Castaldi, Donald L. Nevins, Jr., Robert Alvine, Alfred Weber, Clayton & Dubilier, Inc., Clayton & Dubilier Private Equity Limited Partnership, Clayton & Dubilier Associates Limited Partnership, Martin H. Dubilier, Joseph L. Rice III, and Alan R. Elton, Martin H. Dubilier, Joseph P. Flannery, John R. Graham, and Joseph L. Rice III as Trustees of CDU Holding, Inc. Liquidating Trust, Defendants.

No. 87 Civ. 3297 (CSH).

United States District Court, S.D. New York.

Feb. 13, 1990.

See also, D.C., 728 F.Supp. 926.

Daniel M. Abuhoff, Joseph P. Moodhe, Debevoise & Plimpton, New York City for Uniroyal, Inc., and other defendants.

Andrew W. Goldwater, Friedman & Kaplan, New York City, for Alfred Weber.

### MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate.

This case arises out of the sale in October, 1986 by Uniroyal, Inc. ("Uniroyal") of its wholly owned subsidiary Uniroyal Plastics Company, Inc. ("Plastics") to Polycast Technology Corporation ("Polycast"). Polycast commenced this litigation charging that it entered into the transaction in reliance on misleading financial information about Plastics supplied by Uniroyal. Uniroyal now moves to preclude counsel for Polycast from having *ex parte* communications with Peter J. Petropoulos, a former Uniroyal employee, and from representing Mr. Petropoulos at his upcoming deposition.

*Background*

Mr. Petropoulos was a Uniroyal employee from 1962 until 1987. During 1985 and 1986, he served as Director of Strategic Planning and Business Development for Uniroyal's Engineered Products Group ("EPG"), a subdivision of Uniroyal. One of EPG's components was Uniroyal's Plastics Products Division which was separately incorporated as Plastics in 1985. As director of Strategic Planning and Business Development, Mr. Petropoulos reported to Robert Alvine, Group Vice President for EPG and a named defendant in this action.

After the sale of Plastics to Polycast in 1986, Mr. Petropoulos remained with Uniroyal and its corporate successor until early 1987. From February 1, 1987 to January, 1988, he worked as a consultant for Polycast. He was then employed by Polycast in the areas of strategic planning and business development until September, 1988, when he became a consultant to a

George P. Felleman, Walter Rieman, Carey Ramos, Paul, Weiss, Rifkind, Wharton & Garrison, Sidney H. Stein, Stein, Zauderer, Ellenhorn & Sharp, New York City, for plaintiff.

subsidiary of Plastics. He continued in that capacity until July 31, 1989.

Mr. Petropoulos' involvement in the events underlying this litigation took place when he was Director of Strategic Planning and Business Development for EPG. In that capacity he participated in formulation of the 1986 budget for Plastics which served as part of the basis for an earnings estimate included in the Plastics Offering Memorandum which Polycast alleges was false and misleading. *See* Exh. 1–3 to letter of Daniel M. Abuhoff dated November 3, 1989. He also reviewed portions of the draft offering memorandum itself, though he does not recall what revisions he might have suggested. *See* letter of Walter Rieman dated November 30, 1989 at 20.

Following circulation of the offering memorandum, prospective bidders submitted requests for further information about Plastics. Mr. Petropoulos coordinated Uniroyal's responses to the inquiries made by Polycast, and Polycast alleges that some of the information it received was deceptive. While acknowledging that Mr. Petropoulos transmitted documents between potential bidders and other Uniroyal employees, it characterizes his role as primarily administrative and ministerial and alleges that he played no substantial part in creating the information in the documents. *See* Rieman letter at 20–21.

In the summer of 1989, Uniroyal's attorneys advised Polycast's counsel that they intended to take Mr. Petropoulos' deposition. Polycast's attorneys replied that they would be representing the witness. After further discussions concerning scheduling of the deposition, Uniroyal's counsel raised an objection to Mr. Petropoulos being represented by Polycast's attorneys or having *ex parte* discussions with them. The deposition was then adjourned pending resolution of this dispute, and Uniroyal filed the instant application for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

Uniroyal contends that representation of Mr. Petropoulos by Polycast's counsel together with the concomitant communications would violate Rule 4.2 of the Model Rules of Professional Conduct promulgated by the American Bar Association. Polycast responds that the activities of attorneys in this Court are governed not by the Model Rules, but by the Code of Professional Responsibility. It further contends that, under either standard, it is permissible for counsel to communicate with the former employees of a corporate adversary. In any event, according to Polycast, Mr. Petropoulos was merely a bystander to the events at issue, and his role was therefore not one that would bring into play the proscription against contacting a corporate adversary's employees. Finally, Polycast argues that it would be inequitable to deny its attorneys the opportunity to communicate with Mr. Petropoulos, both because he was formerly Polycast's own employee and because Uniroyal's counsel have themselves conducted *ex parte* interviews with former Plastics employees who continued to work for that company after it was acquired by Polycast.

*Discussion*

A.  Applicable Ethical Guidelines

The threshold question posed by the parties is whether the resolution of this dispute is governed by the Code of Professional Responsibility (the "Code") or by the Model Rules of Professional Conduct (the "Model Rules"). The relevant portion of the Code is Disciplinary Rule ("DR") 7–104(A)(1) which states:

> During the course of his representation of a client a lawyer shall not ... [c]ommunicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

DR 7–104(A)(1), N.Y. Judiciary Law app.

The substance of the corresponding Model Rule 4.2 is virtually identical:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has

the consent of the other lawyer or is authorized by law to do so.

American Bar Association, *Model Rules of Professional Conduct and Code of Judicial Conduct* (1983) at 78. However, the comments to this Model Rule explain its application where the client is not an individual but an organization:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

*Id.* at 79.

■ Federal law governs the conduct of attorneys in the federal courts. *In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985). Generally, that law is embodied in the local rules of each court. Such is the case here. Rule 4(f) of the General Rules of the United States District Courts for the Southern and Eastern Districts of New York provides that an attorney may be disciplined for "conduct violative of the Codes of Professional Responsibility of the American Bar Association or the New York Bar Association from time to time in force."

In light of this rather ambiguous rule, some judges have applied the Model Rules, reasoning that they are the most recent promulgation by the American Bar Association. *See, e.g., Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1082–84 (S.D.N.Y.1989); *Crossland Savings FSB v. Rockwood Insurance Co.*, 700 F.Supp. 1274, 1282–83 (S.D.N.Y.1988); *Sperber v. Washington Heights—West Harlem—Inwood Mental Health Council, Inc.*, No. 82 Civ. 7428, slip op. (S.D.N.Y. Nov. 21, 1983) (LEXIS, Genfed Library, Dist File) (vacated and withdrawn). Others have applied the Code, noting that the Model Rules have never been adopted in New York State. *See, e.g., Cresswell v. Sullivan & Cromwell*, 704 F.Supp. 392, 401 (S.D.N.Y.1989); *United States v. Guerrerio*, 675 F.Supp. 1430, 1432–37 (S.D.N.Y. 1987); *Frey v. Department of Health and Human Services*, 106 F.R.D. 32, 34–38 (E.D.N.Y.1985).

■ Resolution of this conflict should turn on the meaning of the words "in force" in the local rules. It seems best to interpret that language as referring to those ethical guidelines which have not only been promulgated by the bar associations but have also received the imprimatur of the State. In this case, only the Code is "in force," having been adopted as the guide to attorney conduct by each of New York's Appellate Divisions. *See* McKinney's 1988 New York Rules of Court §§ 603.2 (First Department), 691.2 (Second Department), 806.2 (Third Department), 1022.17 (Fourth Department). Two considerations militate in favor of this interpretation of the local rule. First, identification of the ethical principles in effect is facilitated, since the revisions to the ethical guidelines periodically suggested by the bar associations have force only when adopted by the State. Second, this construction avoids subjecting attorneys to potentially inconsistent sets of ethical requirements in the state and federal courts within the same, geographic area. This factor is particularly important because many ethical rules apply even before an action is filed and the forum designated. *See United States v. Guerrerio*, 675 F.Supp. at 1438 n. 16.

In any event, two decisions by the Second Circuit Court of Appeals indicate that the Code rather than the Model Rules is currently applicable in this Court. In *United States v. Hammad*, 846 F.2d 854 (2d Cir.) *modified on other grounds*, 858 F.2d 834 (2d Cir.1988), the Court specifically found that the Eastern District of New York had adopted the Code through its local rules—the same local rules in effect in this Court. *Id.* at 857–58. The Court of Appeals made no mention of the Model Rules, although presumably well aware of them. Furthermore, in *United States v. Kwang Fu Peng*, 766 F.2d 82 (2d Cir.1985),

the court dealt directly with a conflict between the Code and the Model Rules:

> We note that under Rule 3.7(b) of the American Bar Association's new Model Rules of Professional Conduct, a lawyer may call another lawyer from his firm as a witness while himself continuing as counsel. However, such a course is barred by the Code of Professional Responsibility, which has been adopted in New York State and has frequently provided "guidance for the courts in determining whether a case would be tainted by the participation of an attorney or a firm."

*Id.* at 86 n. 1 (quoting *Armstrong v. McAlpin*, 625 F.2d 433, 446 n. 26 (2d Cir.1980), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981)). Thus, in this Court federal law incorporates by reference the Code of Professional Responsibility.

■ This does not mean, however, that this Court is bound by state court interpretations of the Code. Ultimately, the Code is applicable here because the federal court has chosen to require attorneys to follow its guidelines, and federal interpretation of the Code must therefore prevail. Moreover,

> a court need not treat the Canons of Professional Responsibility as it would a statute that we have no right to amend. We should not abdicate our constitutional function of regulating the Bar to that extent. When we agree that the Code applies in an equitable manner to the matter before us, we should not hesitate to enforce it with vigor. When we find an area of uncertainty, however, we must use our judicial process to make our own decision in the interests of justice to all concerned.

*J.P. Foley & Co. v. Vanderbilt*, 523 F.2d 1357, 1359–60 (2d Cir.1975) (Gurfein, J., concurring). In determining the reach of DR 7–104(A)(1), then, it is appropriate to refer to the policies that underlie it, to state and federal cases construing it, and to the analogous Model Rule 4.2 that is derived from it.

**B. Communications with a Represented Party**

**1. *Policies Behind the Rule***

The proscription against a lawyer communicating directly with an opposing party who is represented by counsel is based on a variety of rationales. First, "[i]t prevents unprincipled attorneys from exploiting the disparity in legal skills between attorney and lay people." *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. at 1084. *See also United States v. Guerrerio*, 675 F.Supp. at 1437; *Chancellor v. Boeing Co.*, 678 F.Supp. 250, 252 (D.Kan.1988); Leubsdorf, *Communicating with Another Lawyer's Client; The Lawyer's Veto and the Client's Interests*, 127 U.Pa.L.Rev. 683, 686 (1979); Kurlantzik, *The Prohibition on Communication with an Adverse Party*, 51 Conn.B.J. 136, 138–39 (1977). Thus, the rule prevents a lawyer from circumventing opposing counsel to obtain unwise statements from the adversary party. Second, DR 7–104(A)(1) preserves the integrity of the attorney-client relationship. *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. at 1084; *United States v. Guerrerio*, 675 F.Supp. at 1437 n. 14. That is, counsel is precluded from driving a wedge between the opposing attorney and that attorney's client. Third, the rule helps prevent the inadvertent disclosure of privileged information. Kurlantzik, *supra* at 145–46. And, finally, it may facilitate settlement by channelling disputes through lawyers accustomed to the negotiation process. *Id.* at 148–51.

Some of these considerations have little relevance to a party that is an organization and even less when the communication is made by an attorney to a former employee of that organization. For example, since an ex-employee no longer acts on behalf of a corporation, he would not be a party to settlement negotiations. Nor would he have any current attorney-client relationship to his former employer's attorney that would be jeopardized by direct contact with him.

On the other hand, a former employee may have privileged information obtained either while he was employed or when he

subsequently assisted his former employer's attorney in marshalling evidence for the litigation. *See Amarin Plastics, Inc. v. Maryland Cup Corp.*, 116 F.R.D. 36, 40 (D.Mass.1987). Furthermore, the interest in protecting against an overreaching attorney, though attenuated, is still present. It is diminished to the extent that the former employee is no longer subject to retaliation by the employer for making statements that might cause the corporation to incur liability. But the corporation retains an interest in preventing an opposing attorney from eliciting uncounselled statements from its former employees, since the "shading" of such statements can affect the corporation's potential liability.

As applied to former employees, then, two of the purposes underlying DR 7–104(A)(1) come into play: the need to protect privileged communications and the desire to protect the enterprise from liability-creating statements obtained through the greater skill of the lawyer. We can turn now to the ways in which the courts and other authorities have applied DR 7–104(A)(1) to former employees.

### 2. *Traditional View of the Rule*

Originally, the rule against communication with a represented party permitted an attorney to interview even the current employees of a corporate party. *See* Leubsdorf, *supra*, at 694–95. However, it came to be recognized that a corporation acts only through its employees, and that the rule has meaning with respect to a corporate party only if applied to at least some of its employees. Accordingly, on the basis of DR 7–104(A)(1), some courts have precluded attorney communications with managerial employees of an enterprise. *See Frey v. Department of Health and Human Services*, 106 F.R.D. at 36–37. Others have barred attorneys from interviewing any current employee of a corporation. *See Niesig v. Team I*, 149 A.D.2d 94, 100, 545 N.Y.S.2d 153, 157 (2d Dep't 1989). In any event, however, the traditional view has been that former employees are not encompassed within the term "party" in DR 7–104, and so may be contacted without notice to the corporation's attorney. *See*

*id.* at 98, 100 n. 1, 545 N.Y.S.2d at 156, 157 n. 1.

### 3. *Impact of the Model Rules*

Several courts and commentators, however, have suggested that a corporate "party" may be defined more broadly to include certain former employees. *See Chancellor v. Boeing Co.*, 678 F.Supp. at 253; *Amarin Plastics, Inc. v. Maryland Cup Corp.*, 116 F.R.D. at 39–40; *Sperber*, slip op. (S.D. N.Y. Nov. 21, 1983); Stahl, *Ex Parte Interviews with Enterprise Employees: a Post–Upjohn Analysis*, 44 Wash. & Lee L.Rev. 1181, 1220–21 (1987). These authorities rely on the comments to Model Rule 4.2. As noted above, these comments define an organizational "party" as including: (1) managerial employees, (2) any other person whose acts or omissions in connection with the matter at issue may be imputed to the corporation for liability, and (3) persons whose statements constitute admissions by the corporation. While the first and third categories are clearly limited to current employees, it is argued that the second category is broad enough to include former employees whose acts could result in vicarious liability for the employer.

This interpretation of the comment is not universally shared. Professor Geoffrey C. Hazard, Jr., Reporter for the ABA Commission on Evaluation of Professional Standards at the time the Model Rules were promulgated, stated in reference to the comments to Model Rule 4.2:

> This regime does not address communications with *former* agents and employees, and technically there should be no bar, since former employees cannot bind the organization, and their statements cannot be introduced as admissions of the organization. Speaking with a former employee therefore does not do damage to the policy underlying Rule 4.2—undercutting or "end-running" an on-going lawyer-client relationship.

Hazard & Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* at 436 (1988 Supp.) (emphasis in original; citation omitted).

The expansive language of the second prong of the comment can be explained in a

fashion that does not implicate former employees at all. In 1981, the draft comment to Model Rule 4.2 identified as the "party" only those employees whose status made them alter egos of the enterprise:

> This rule prohibits communication concerning the matter in representation by a lawyer for the party with managing agents of a party that is a corporation or organization, for such persons speak for the organization. It does not prohibit communication with lower echelon employees who are not representatives of the organization. Whether a specific employee is a representative of a client can depend on the circumstances, particularly whether the employee has significant managerial responsibility in the matter in question.

Comment to Rule 4.2, Proposed Final Draft, Model Rules of Professional Conduct, As Revised Through May 1981 (American Bar Association, Commission on Evaluation of Professional Standards, 1981) (quoted in Stahl, *supra*, at 1219).

Recognizing that this standard left exposed many vulnerable lower level employees, the ABA substituted the current comments. It retained the alter ego approach with respect to the first category dealing with managerial employees. It then extended the definition of "party" to include lower level persons involved in the transaction or event at issue:

> A typical example would be a truck driver whose involvement in an accident led to a lawsuit against his employer. The truck driver is plainly not in the control group, yet the company and the company's lawyer have a strong interest in monitoring what he says to their opponent, because their opponent can use what he says free of the hearsay rule.

Hazard & Hodes, *supra*, at 436. Although the comment refers to "any other person" from whose act corporate liability may be imputed rather than "any employee," this does not imply an intent to include former employees. More likely, it was designed to cover agents whose acts are attributable to an organization but who may not technically be employees.

Yet even this addition did not fully embody the functional approach. To protect current lower level employees who committed no liability-creating acts or omissions but who were witnesses to the relevant events, it was necessary to add the third category: persons whose statements would constitute admissions by the corporation. The statements of such bystanders taken while they were still employees would be admissible against the employer under the hearsay rule and the declarants are therefore considered to be "parties". *See* F.R. Evid. 801(d)(2)(D); *Carl Wagner and Sons v. Appendagez, Inc.*, 485 F.Supp. 762, 773–74 (S.D.N.Y.1980).[1]

The expanded comments to Rule 4.2, then, were not designed to make former employees adjuncts of the corporate "party." Rather, they were intended to insure that current employees—whether participants or witnesses—would not be subject to interrogation by an adversary's attorney except through formal discovery.

### 4. *The Definition of "Party"*

The traditional interpretation of DR 7–104(A)(1) did not include former employees within the definition of the corporate "party." The text of Model Rule 4.2 did not deviate in substance from the earlier rule, and the comments, while more expansively worded, do not clearly indicate a departure. We must return then, to the policies underlying the proscription against communication with a represented party to determine if those principles require that the rule apply to former employees.

The interest in preventing inadvertent disclosure of privileged material does not justify a blanket ban on communication

---

**1.** Uniroyal argues that unless former employees are covered by the second category, then that category would be rendered superfluous by the third, since any current employee whose acts create vicarious liability is also one whose statements constitute corporate admissions. This contention relies too heavily on the niceties of the draftsmanship and too little on the purposes and history of Rule 4.2. Indeed, by this argument the first category would also be superfluous, since any statement by a managerial employee would presumably be an admission attributable to the enterprise.

with the opposing party's former employees. In most situations a former employee will not be privy to the corporation's legal strategies after his employment has terminated. Similarly, many employees will have no access to privileged information even while employed. Accordingly, the problem of protecting privileged material is best dealt with on a case-by-case basis. Where there is a strong likelihood that a former employee does possess such information, an appropriately tailored order can be issued.

The corporation's interest in counseling a former employee whose acts may lead to imputed liability is likewise an insufficient basis for extending the definition of "party" to such persons. While such a participant's statements to opposing counsel may be damaging to the corporation, they are no more so than the statements of a former employee who merely witnessed the liability-creating acts but did not commit them. Yet there is no dispute that the opposing attorney may interview the latter witness freely. And, of course, counsel for the corporation may depose its own former employee to learn facts and to lock in his testimony.

■ On the other side of the ledger, there are strong reasons why it would be unwise to expand the definition of a corporate party beyond its present contours. First, any shift away from informal information gathering toward formal discovery increases costs and reduces judicial efficiency. See Oak Industries v. Zenith Industries, 86 C. 4302, 1988 WL 79614 (N.D. Ill. July 27, 1988), 1988 U.S.Dist. LEXIS 7985 at *5; Frey v. Department of Health and Human Services, 106 F.R.D. at 36. Second, and more important, it would act as a deterrent to the disclosure of information. Former employees often have emotional or economic ties to their former employer and would sometimes be reluctant to come forward with potentially damaging information if they could only do so in the presence of the corporation's attorney. See Oak Industries v. Zenith Industries, 1988 WL 79614 1988 U.S.Dist. LEXIS 7985 at *5. Whatever the right of the corporation to "barricade" against ex parte contact those potential witnesses who are current employees, see Frey v. Department of Health and Human Services, 106 F.R.D. at 36, former employees are outside the ramparts. There is therefore no ethical bar against Polycast's attorneys having ex parte communications with Mr. Petropoulos or representing him at his deposition.[2]

## C. Attorney–Client Privilege

■ Finally, Uniroyal argues that even if Mr. Petropoulos is not subject to the bar on ex parte communications by virtue of his role in the transactions, the bar should nevertheless apply because he may have had access to confidential communications. Thus, according to Uniroyal, ex parte contact should be barred to prevent inadvertent disclosure of such information.

Indeed, privileged communications do present a distinct problem with respect to contact with former employees. After rejecting the notion that Model Rule 4.2 cov-

---

**2.** Polycast raises two alternative arguments in support of this result, neither of which has merit. First, Polycast contends that Mr. Petropoulos was a mere bystander to the transactions at issue such that his acts would not be attributed to Uniroyal for purposes of creating liability. However, there is evidence that he was directly involved in the creation of a budget that served as a basis for earnings estimates that Polycast characterizes as misleading. Moreover, even if his role in responding to Polycast's own inquiries was that of a coordinator rather than a creator of information, his acts could still give rise to liability to the extent that he exercised discretion in selecting what data would be passed on.

Second, Polycast's "equitable" arguments are misplaced. Though Uniroyal may have had ex parte contacts with former Polycast or Plastics employees, there is no allegation that such employees were direct participants in the subject transactions. Therefore, if ethical considerations required a bar on communications in such circumstances there would be no unfairness in applying it exclusively to contacts with Mr. Petropoulos. Likewise, preventing Polycast from communicating with someone who was its own former employee would not be anomalous. The acts at issue occurred when Mr. Petropoulos was Uniroyal's employee, and his subsequent employment relation with Polycast is idiosyncratic and would have no bearing on the ethical considerations.

ers former employees generally, Professor Hazard continued:

> Yet it seems clear that *some* former employees continue to personify the organization even after they have terminated their employment relationship. An example would be a managerial level employee involved in the underlying transaction, who is also conferring with the organization's lawyer in marshalling evidence on its behalf. But the rationale is a different one. This kind of former employee is undoubtedly privy to privileged information, including work product, and an opposing lawyer is not entitled to reap a harvest of such information without a valid waiver by the organization, or according to narrow exceptions in the discovery and evidence rules.

Hazard & Hodes, *supra,* at 436–436.1 (emphasis in original; citation omitted).

In such circumstances, the former employer is well aware of the existence of the privileged communications. Yet, in this case Uniroyal has failed to identify any specific privileged information to which Mr. Petropoulos was privy, and it has therefore failed to carry its burden of justifying any protective order at this time. *See von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 144 (2d Cir.1987), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1988) (proponent of privilege has burden). Should Uniroyal come forward with evidence that privileged communications might be in jeopardy, a narrowly-tailored order might be appropriate.

*Conclusion*

In this Court, then, the Code of Professional Responsibility currently prescribes the ethical conduct of attorneys, and the Code may be interpreted in light of judicial decisions and commentary from other sources. In this case, DR 7–104 does not require a ban on *ex parte* communications with a former employee, even if it is interpreted in light of the comments to Model Rule 4.2. Nor has there been a sufficient showing that contacts with the former employee would jeopardize privileged communications. Accordingly, Uniroyal's motion for a protective order is denied.

SO ORDERED.

