Robert H. **DORSEY, et al.,**
**Plaintiffs–Appellants,**

v.

The **CITY OF DETROIT, et al.,**
**Defendants–Appellees.**

No. 86–1416.

United States Court of Appeals,
Sixth Circuit.

Argued June 9, 1987.

Decided Oct. 4, 1988.

Ernest L. Jarrett, argued, Detroit, Mich., Peter J. Parks, for plaintiffs-appellants.

Marion Jenkins, argued, Law Department–City of Detroit, Detroit, Mich., for defendants-appellees.

Before WELLFORD, MILBURN, and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This is an action against the City of Detroit and certain of its police officers for allegedly violating the civil rights of a fleeing misdemeanant and his mother. When the mother tried, as she claimed, to prevent the arresting officers from injuring her son in the course of his arrest, she was arrested too. Mother and son contend on appeal that the trial court erred in allowing their case to be removed from a state court and erred in admitting into evidence a police report, highly favorable to the defendants, that the plaintiffs say had been withheld during discovery as part of a deliberate scheme to undermine the mother's testimony. Nondisclosure of the report prejudiced the mother's case, as we see it, but not the

son's. We shall remand the mother's claims for a new trial, but affirm the judgment of the district court in all other respects. We are not persuaded that it was error to let the case be removed to federal court.

## I

At about 1:30 in the morning on Sunday, November 22, 1981, Detroit Police Officers Butucel and Robinson saw plaintiff Robert Dorsey driving a car without any lights. Mr. Dorsey was going the wrong way on a one-way street. The officers attempted to stop him; he fled, and they gave chase.

Mr. Dorsey drove to the neighborhood where his mother lived. He stopped in front of her house, got out of the car, and ran up to the house. The witnesses differed on what happened next.

Mr. Dorsey testified that as he was banging on the door and calling for his mother, both officers ran up with guns drawn. Officer Butucel shouted "kill him," according to Mr. Dorsey, and both officers "were yelling and screaming at me to lay down." His mother, plaintiff Margaret Dorsey, appeared at the door and told him to lie down on the porch. He did so, and was handcuffed by the officers. Then Officer Robinson allegedly dragged him down the porch steps and started hitting him. Officer Butucel was said to have punched and kicked him in the chest and face with his fists and a flashlight. At this point, according to Mr. Dorsey, his mother went up to the officers and pleaded with them not to kill him. She attempted to hold Officer Butucel back, whereupon he hit her in the mouth with his flashlight. She tried to retreat into her house, but Officer Butucel, shouting profanities, grabbed her and put her in handcuffs.

Other police officers had arrived by then, Mr. Dorsey continued, and they put him in one police car and his mother in another. Officer Butucel took Mr. Dorsey's car keys to move the latter's car, which had been left in the middle of the street—and, according to Mr. Dorsey, the officer proceeded purposely to drive the vehicle into Mrs. Dorsey's parked car. Officer Butucel then returned to Mr. Dorsey, showed him a pipe wrapped in masking tape, and said it had been found in his car. When Mr. Dorsey disclaimed ownership of the pipe, he was beaten with it in the chest. On the way to the police station, Mr. Dorsey testified, the police car was stopped so that Officer Butucel could beat him again.

Mrs. Dorsey's account of the incident, as far as it went, largely corroborated her son's. The arresting officers, on the other hand, testified that Robert Dorsey vigorously resisted arrest and they merely used reasonable force to subdue him. Officer Butucel testified that as he and Officer Robinson ran toward the house, Mr. Dorsey was at the door with a pipe in his hand. Mr. Dorsey refused to drop it, and the two officers grabbed him by the legs. The three men then tumbled down the porch steps, with Mr. Dorsey kicking and trying to escape. They were on their hands and knees trying to handcuff Mr. Dorsey, who was "biting, kicking, swinging," when Mrs. Dorsey came out of the house and picked up a shovel. She started kicking the officers and swinging the shovel at them, and she hit Officer Butucel in the shoulder with the shovel. He pushed her away, he testified, but she came at him again, and he pushed her a second time. Officer Butucel could not recall whether he was carrying a flashlight, or whether he ever hit Mrs. Dorsey with a flashlight.

A citation filed against Mrs. Dorsey by Officer Butucel after she was arrested made no mention of the shovel; the citation merely said that she "interfere[d] with city official in front of 17852 Fleming in that [she] pushed a police officer, attempting to arrest a suspect in front of that [address]." Officer Butucel testified that he intentionally omitted mention of the shovel so that he would not have to charge Mrs. Dorsey with a felony. Officer Butucel further testified that he discussed the incident with his fellow officers before writing the complaint, and they all felt that Mrs. Dorsey deserved a "break" because of her age and the unusual circumstances surrounding her arrest. A police report written by Officer Butucel after the incident states that Mrs.

Dorsey was swinging a shovel, but does not mention her hitting anyone with it. The trial testimony of Officer Robinson, the other arresting officer, corroborated the evidence that Mrs. Dorsey had a shovel, but was equivocal about the use she made of it.

A police sergeant, Byron Graber, arrived on the scene during the excitement. In a report that he prepared on the day of the incident—a report that constitutes the main bone of contention on this appeal—Sergeant Graber summarized what he had been told as follows:

"The officers grabbed the suspect and as they were leaving the porch a struggle ensued. As the officers were struggling with the man on the ground in order to subdue him, a woman exited 17852 Fleming screaming at the officers, she picked up a shovel and began swinging at the officers. She was ordered to drop the shovel, at which time she did. Then she started to shove the officers who at this time were handcuffing the suspect. Officer Butucel swung his free hand and shoved the woman backwards. She then again charged towards the officers shoving and striking them with her fists. For a second time Officer Butucel pushed her away with his hand and it was at this time they succeeded in handcuffing the suspects."

Sergeant Graber's first-hand observations were set forth thus:

"When writer arrived at # 11, Robert Dorsey was lying on the floor yelling and screaming profanities. He was frothing at the mouth and appeared to be having some type of seizure. Finally he calmed down, he told writer that his ribs hurt because the officers had kicked him. I detected no visible signs of injury. It appeared he had not been drinking. I observed a small abrasion under the right lip of Margaret Dorsey, I inquired how she suffered the injury and she stated the white officer hit her with something hard in her mouth. She stated that when she saw the officers struggling with her son, she came to his assistance, swinging the shovel. She was in night clothing and had not been drinking. I

asked her if Robert had ever suffered a seizure before and she stated that he was very 'hyper'. At this time, I ordered both prisoners to the hospital for treatment. Both refused to sign the Medical Release Forms."

Sometime during the early hours of the morning, both Robert Dorsey and his mother were taken to the emergency room of Detroit Receiving Hospital. The hospital records indicate that Robert Dorsey was given valium for gastritis, palpitations, and hyperventilating. There was a notation about an abrasion on his right jaw and a contusion on his left abdomen. Robert Dorsey was reported to have a "nervous condition" and to "answer[ ] 'don't know' to all questions." Mrs. Dorsey's medical report indicates that she was treated for a blow to her chin by a flashlight.

The Dorseys were released from police custody after daybreak. Robert Dorsey was later convicted of attempted fleeing and eluding. Mrs. Dorsey was charged with interfering with a city employee, but her case was dismissed when Officer Butucel failed to appear in court on the date assigned for trial.

## II

■ Plaintiffs (who include grandchildren cared for by Mrs. Dorsey) originally brought suit in federal district court. That action was voluntarily dismissed without prejudice. Plaintiffs later sued in state court, alleging violations of 42 U.S.C. § 1983 and Michigan law. The state court action was removed to federal district court pursuant to 28 U.S.C. § 1441(b) and (c). The plaintiffs contend that the district court erred in declining to send the case back to the state court when asked to do so.

Noting that Congress has allowed § 1983 claims to be maintained in state as well as federal courts, and asserting that "[i]t is well settled that the plaintiff is the master of his claim, and may choose what law to rely on," plaintiffs argue that "where Congress has provided for concurrent jurisdiction in state and federal courts, the claim

may be asserted in either court and removal on the basis of federal question jurisdiction is precluded." *Salveson v. Western States Bankcard Association*, 525 F.Supp. 566, 573 (N.D.Cal.1981) (footnote omitted), *aff'd in part and rev'd in part*, 731 F.2d 1423 (9th Cir.1984); *see also Johnson v. Butler Brothers*, 162 F.2d 87 (8th Cir. 1947); *Jones Store Co., Inc. v. Hammons*, 424 F.Supp. 494, 496–97 (W.D.Mo.1977); *Young v. Board of Education of Freemont County School District, RE–3*, 416 F.Supp. 1139 (D.Colo.1976); *Egner v. Texas City Independent School District*, 338 F.Supp. 931 (S.D.Tex.1972).

Our court has never directly addressed the theory raised by appellants, as far as we have been able to ascertain. Although the theory does have some support in caselaw from other circuits, it is hard for us to reconcile it with the plain words of the pertinent statutes. Congress has said in 28 U.S.C. § 1441(a) that except where otherwise expressly provided by statute, "any" civil action of which the federal district courts have original jurisdiction may be removed. Section 1983 actions are not included among the nonremovable actions listed in 28 U.S.C. § 1445, and no other statute provides, expressly or otherwise, that § 1983 actions are nonremovable. The weight of judicial authority supports the conclusion that "a Congressional grant of concurrent jurisdiction in a statute does not imply that removal is prohibited." 14A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 3729, at 495 (1985); *see Cosme Nieves v. Deshler*, 786 F.2d 445 (1st Cir.), *cert. denied*, 479 U.S. 824, 107 S.Ct. 96, 93 L.Ed.2d 47 (1986); *Baldwin v. Sears, Roebuck & Co.*, 667 F.2d 458 (5th Cir.1982); *Whitfield v. Federal Crop Insurance Corp.*, 557 F.2d 413 (4th Cir.1977); *Beckman v. Graves*, 360 F.2d 148 (10th Cir.1966); *Mercy Hospital Association v. Miccio*, 604 F.Supp. 1177 (E.D.N.Y.1985); *Routh v. City of Parkville*, 580 F.Supp. 876 (W.D.Mo.1984); *McConnell v. Marine Engineers Beneficial Association*, 526 F.Supp. 770 (N.D.Cal.1981); *Barrett v. McDonald's of Oklahoma City*, 419 F.Supp. 792 (W.D.Okla.1976); *Sheeder v. Eastern Express, Inc.*, 375 F.Supp. 655 (W.D.Pa.1974); *Hill v. Moss–American, Inc.*, 309 F.Supp. 1175 (N.D.Miss.1970). We agree with the conclusion these cases have reached.

## III

### A

Following a seven-day trial in the district court, a jury returned a verdict in favor of the defendant police officers. Mrs. Dorsey and her son have appealed the judgment entered on the jury verdict, and they have appealed a directed verdict entered in favor of the city. Mrs. Dorsey's grandchildren have appealed a directed verdict in favor of all defendants on the grandchildren's claims. The plaintiffs' principal claim of error relates to the trial court's decision to let Sergeant Graber's police report be received in evidence despite the defendants' failure to produce it during discovery.

In the initial federal action the plaintiffs served a production request that clearly covered Sergeant Graber's report. The plaintiffs later filed a motion to compel discovery the terms of which also covered Sergeant Graber's report. The defendants agreed, by stipulation, to produce all of the described documents. They had not done so, however, by the time the plaintiffs took a voluntary dismissal of their suit two months later. (The defendants' failure to cooperate in discovery was one of the reasons assigned by the plaintiffs for taking a dismissal; the other was that Mr. Dorsey was unavailable because of his incarceration.)

After the action had been refiled and removed to federal court, the parties appear to have continued with informal discovery on the basis of their earlier understandings and stipulations. The docket of the district court discloses no formal discovery proceedings until the plaintiffs filed a notice for the depositions of the defendants, including Sergeant Graber. A few weeks later, on June 27, 1985, the defendants were served with a request to produce certain police department documents to be described in subpoenas. What happened as a result of that request is not clear, but at

some point the plaintiffs were provided copies of the arresting officers' report and other documents. Sergeant Graber's report was not produced; plaintiffs' counsel first learned of its existence on the morning of the last day when testimony was taken at trial. At that time the report was introduced over objections that it contained inadmissible hearsay and had been improperly withheld during discovery.

Counsel for defendants maintained in his brief on appeal that he had not been obligated to produce Sergeant Graber's report in the present case because the discovery requests made in the original case did not affect this one. (No mention was made of the request for production served on June 27, 1985.) At oral argument, however, defendants' counsel conceded that both parties had proceeded on the basis of the discovery stipulation entered into prior to the voluntary dismissal. Counsel suggested that he was nonetheless excused from producing Sergeant Graber's report because it was "unavailable" to him at the time other requested documents were turned over to the plaintiffs.

If the report was temporarily "unavailable" for some reason, we confess ourselves at a loss to understand why defendants' counsel should have supposed that he had no obligation at least to disclose the existence of the report, and to turn it over to plaintiffs' counsel as soon as he could. His failure to discharge that obligation should have led the district court to refuse to let the report be admitted, we believe, even though we do not think the report was inadmissible on hearsay grounds.

As to the hearsay question, Rule 803(6), Fed.R.Evid., provides that although a declarant be available as a witness, the hearsay rule does not exclude

"[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, *or from information transmitted by, a person with knowledge,* if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memoran-

dum, report, record, or data compilation, *all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.* The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit." (Emphasis added.)

Plaintiffs advance three reasons why the police report was not properly admitted pursuant to Rule 803(6). First, they argue that no foundation was laid for the introduction of the business record "by the testimony of the custodian or other qualified witness." But Officer Jones, who had worked under Sergeant Graber's supervision, testified that Sergeant Graber prepared such reports in the ordinary course of business, and Jones identified the signature on the report as Sergeant Graber's. See Fed.R.Evid. 901.

Plaintiffs claim that Officer Jones was not a qualified witness because she did not have personal knowledge of what Sergeant Graber did in preparing the report. This claim is unavailing. The rule does not require a qualified witness to have personal knowledge of the making of the business record; "all that is required is that the witness be familiar with the record keeping system." *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986).

Second, plaintiffs argue that the report contains matter not within the personal knowledge of the report's preparer, such matter being inadmissible "hearsay within hearsay." This argument too is unavailing; Rule 803(6) expressly sanctions the use of "hearsay within hearsay" when it makes admissible records prepared "from information transmitted by" someone with knowledge.

The plaintiffs' third argument is that the report lacks trustworthiness because in it Sergeant Graber "renders his opinion concerning the nature and severity of the injuries suffered by Plaintiffs" and "states his opinions as to the propriety of the Defendants' conduct." In addition to noting that

Mr. Dorsey "appeared to be having some type of seizure" and that no "visible signs of injury" were detected, the report contains these conclusions by Sergeant Graber:

> "The writer's investigation reveals that the officers were engaged in a lawful and proper police function. It is this writer's opinion that Officers Butucel and Robinson used no more than necessary force to effect the arrest of Mr. Dorsey. Officer Butucel appears to have been injured as a result of police action. The alleged injury to Robert Dorsey and the injury to Margaret Dorsey seem minimal under the circumstances. Investigation reveals that both parties were hostile and combative in their actions. The injuries occurred as a direct result of their hostilities towards the officers."

The plaintiffs say these remarks are "self-serving, and invade the province of the jury as [the remarks] rendered conclusive opinions on the ultimate issue of fact to be determined."

The force of this argument is vitiated somewhat by the Notes of the Advisory Committee on the Rules. The Notes explain that "the rule [803(6)] specifically [permits] both diagnoses and *opinions*, in addition to acts, events, and conditions, as proper subjects of admissible entries." (Emphasis added.) The Notes do, however, add these words of caution:

> "The direct introduction of motivation is a disturbing factor, since absence of motivation to misrepresent has not traditionally been a requirement of the rule; that records might be self-serving has not been a ground for exclusion.... Yet hesitation must be experienced in admitting everything which is observed and recorded in the course of a regularly conducted activity.... The formulation of specific terms which would assure satisfactory results in all cases is not possible. Consequently the rule proceeds from the base that records made in the course of a regularly conducted activity will be taken as admissible but subject to authority to exclude if 'the sources of information or other circumstances indicate lack of trustworthiness.' "

In support of their contention that the circumstances under which Sergeant Graber's report was prepared indicated a lack of trustworthiness, the plaintiffs cite *Bracey v. Herringa*, 466 F.2d 702 (7th Cir. 1972). That case held it was error for a district court, in disposing of a summary judgment motion in a § 1983 action, to consider a report prepared by prison guards:

> "That prison guards may be held accountable under 42 U.S.C. § 1983 for physical beatings of prisoners, deprivation of medical care, or deprivation of hygienic conditions, has been established for enough years that it can safely be assumed at least some guards write their reports on such occurrences with that possibility in mind." 466 F.2d at 704 (footnotes omitted).

Sergeant Graber's report raises motivational questions similar to those that troubled the *Bracey* court. Nevertheless, we believe the district court would have had discretion to admit Sergeant Graber's report if it had been produced during discovery, because production in advance would have enabled plaintiffs' counsel to prepare himself to test its trustworthiness at trial. The defendants' witnesses could have been cross-examined in light of the report, and the jury could have made an informed judgment on how much weight the report deserved. *See Hathaway, supra,* 798 F.2d at 907.

In this instance, however, the plaintiffs did not have a fair opportunity to challenge the report's credibility. When the report was finally sprung on them, they could not attack it without recalling witnesses who had testified earlier. They could not interrogate the author of the report, because he had moved to Nevada and they could hardly have deposed him there on the last day of testimony.

Rule 26(e), Fed.R.Civ.P., partially exempts attorneys from having to supplement discovery responses that were complete when made, but it does not remove the burden of providing a complete and accurate response in the first instance.

Rule 26(e)(2) imposes a duty seasonably to amend a prior response if a party obtains information showing that the response was incorrect when made. And, as the Advisory Committee Notes to the 1970 Amendments to Rule 26 state, "[t]his exception does not impose a duty to check the accuracy of prior responses, but it prevents knowing concealment by a party or attorney." The failure to provide a key investigative report on the police brutality charges that were the basis of the present lawsuit looks suspiciously like "knowing concealment." In any event, the surprise evidence requires us to consider whether the plaintiffs are not entitled to a new trial.

### B

██ "In order to prevail on his motion for a new trial, plaintiff must show that he was prejudiced and that failure to grant a new trial is inconsistent with substantial justice." *Erskine v. Consolidated Rail Corp.*, 814 F.2d 266, 272 (6th Cir.1987). These tests are met, we believe, in Mrs. Dorsey's case.

The jury could not properly evaluate Mrs. Dorsey's claim without knowing whether she was in fact swinging a shovel at the officers; if she was not, there probably would have been no reason to use any significant force against her. Defense counsel structured his cross examination of Mrs. Dorsey to highlight the inconsistencies between her version and that reflected in the still undisclosed report, thereby enhancing the dramatic impact of the report when it was introduced at the end of the trial. Under the circumstances, we are not prepared to say that counsel's failure to produce the report was unlikely to have made any difference because the report was merely cumulative of what was in Officer Butucel's report.

Sergeant Graber's report did not, however, play a similarly crucial role in Mr. Dorsey's case. It was not he who was supposed to have swung the shovel, and the report did not prejudice him in the way it prejudiced his mother. We do not believe it would be inconsistent with substantial justice to let the judgment against Mr. Dorsey stand.

### IV

Plaintiffs also complain that defendants were guilty of misconduct in proffering evidence that Robert Dorsey had been convicted of armed robbery. That the district judge sustained all objections to the attempted character impeachment cannot cure the prejudice plaintiffs suffered, they say, because the "damage was done."

Rule 404(b), Fed.R.Evid., provides:

**"(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In all of the instances in which the judge sustained plaintiffs' objections, one can point to permissible purposes "other" than character impeachment. We do not believe that defendants acted improperly in attempting to raise the subject of the prior felony conviction.

### V

The district court did not err in directing a verdict against the grandchildren. Having reviewed the transcript of the trial, we agree with the district court that there was no evidence that the defendants took any improper action against the grandchildren or that the grandchildren suffered any compensable injury.

### VI

Plaintiffs advance two arguments why judgment should not have been entered in favor of the city on the Michigan state law claims. Citing *Ross v. Consumers Power Co.*, 420 Mich. 567, 621, 363 N.W.2d 641, 662 (1984), which says that a governmental agency "will be held directly liable for its torts if the activity in which it was engaged constituted a non-governmental or proprietary function," plaintiffs contend that the

city was engaged in a non-governmental function when, as they claim, its agents intentionally mistreated them. The activity in which the city was engaged, however, was providing police protection to its citizens, and that is a quintessentially governmental activity.

Secondly, plaintiffs argue that the city is vicariously liable for the acts of its police officers. This argument is untenable in light of *Sherbutte v. Marine City,* 374 Mich. 48, 50, 130 N.W.2d 920, 921 (1964) (city cannot be held vicariously liable for torts of its police officers committed during the course of an arrest because the officers were engaged in police activity, which is a governmental function entitled to immunity).

With regard to the § 1983 claim against the city, this case is governed by the following passage from *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978):

"We conclude ... that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."

The plaintiffs in the case at bar failed to present a case comparable to that made out in *Marchese v. Lucas,* 758 F.2d 181 (6th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987). In *Marchese,* the court found "official toleration (if not complicity in instigation), of the midnight assault on the part of the command officers on duty at the station house that night; but there was also subsequent concealment followed by a complete failure to initiate and conduct any meaningful investigation on the part of the Sheriff himself." 758 F.2d at 187–88. There is no evidence in the present case that it was the custom or policy of the City of Detroit to instigate or condone violation of citizens' constitutional rights. On the contrary, the evidence showed that the city has adopted detailed procedures to safeguard citizens' interests during arrests and following complaints of police brutality. There is no suggestion that these procedures were customarily ignored. Plaintiffs' case against the city rested solely on the theory of *respondeat superior,* and the city was clearly entitled to the directed verdict it received.

The judgment against Mrs. Dorsey on her claims against the police officers is REVERSED, and her case is REMANDED for a new trial on those claims only. The judgment against the other plaintiffs is AFFIRMED.