**In re Richard EGBERT.**

**No. 96–MC–15.**

United States District Court,
D. Rhode Island.

Jan. 22, 1999.

Torres, J., filed concurring opinion

Leonard C. Boyle, Chief, United States Attorney's Office, New Haven, CT, for petitioner.

Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA, Peter DiBiase, Providence, RI, for defendant.

## MEMORANDUM AND DECISION

LISI, District Judge.

### I. *Background*

Pursuant to Rule 4 of the Local Rules of the United States District Court for the District of Rhode Island, the active judges of this Court conducted a hearing for the purpose of determining whether attorney Richard Egbert violated the Rules of Professional Conduct while acting as counsel admitted *pro hac vice* in the case of *United States v. Ouimette*, Cr. 95–029–T. The events precipitating the hearings are contained in the record of that case which includes transcripts of a hearing conducted on November 13, 1995, regarding Mr. Egbert's motion to enter an appearance on behalf of co-defendant, Kenneth Raposa, and a show cause hearing conducted on December 13, 1995. Briefly stated, the background facts are as follows:

In June of 1995, Gerard Ouimette, Kenneth Raposa and three other defendants were indicted for participating in the use of extortionate means to attempt to collect extensions of credit in violation of 18 U.S.C. § 891. Count V of the indictment charged both Ouimette and Raposa with participating in the attempted extortion of David J. Duxbury.

Egbert entered an appearance *pro hac vice* on behalf of Ouimette. Raposa initially was represented by attorney Joseph Balliro. In mid-July, Balliro withdrew and attorney Scott Lutes was appointed to represent Raposa.

During the ensuing three months, Egbert and Lutes filed a variety of pretrial motions on behalf of their respective clients. One of those motions was a motion to suppress which led to a two-day evidentiary hearing in which both Egbert and Lutes participated. The motion to suppress was denied but, on October 6, Raposa's motion to sever his trial from the trial of Ouimette and two other co-defendants was granted. At that time, the Court advised counsel that the Raposa case would be placed on the November trial calendar.

Several days later, the Ouimette trial began. During the trial there was testimony to the effect that Ouimette and Raposa both participated in beating Duxbury and that one of them, the witness was not certain which one, demanded money from Duxbury. On October 26, the jury returned guilty verdicts against Ouimette on all counts, including the count charging extortion of Duxbury. Ouimette's sentencing was scheduled for late January.

Some time after the verdict was returned in the Ouimette case but before November 2, 1995, Raposa contacted Egbert to discuss whether Egbert "would consider representing him in his upcoming trial." (7/11/96 Tr. at 34.) At that time, Lutes was engaged as second chair in a murder trial in New Bedford, Massachusetts, and impanelment in Raposa's case was scheduled for November 7.

At their initial meeting, Egbert declined to represent Raposa. However, on November 2, 1995, Raposa again came to Egbert's office and implored him to reconsider. Because Raposa appeared to be "frantic", Egbert agreed to reconsider, but still made no commitment. He told Raposa that Raposa first would have to agree to take a polygraph examination that "was confidential ... pursuant to the attorney/client relationship." (7/11/96 Tr. at 37.) Because Egbert had not yet agreed to represent Raposa, he kept two $4,000 checks from Raposa in his desk draw-er and did not deposit them until November 7. (7/11/96 Tr. at 53.)

Raposa agreed to the polygraph examination and Egbert made the necessary arrangements. The polygraph examination was administered on the following day, Friday, November 3, without Lutes' knowledge.

The results of the polygraph examination were reported verbally to Egbert that afternoon. He viewed them as favorable. That same day, after obtaining Raposa's permission, Egbert telephoned Assistant United States Attorney James Leavey and attempted to persuade him to reassess the government's position in light of the polygraph results. (7/11/96 Tr. at 39–42.) However, at that time Egbert still had not agreed to be trial counsel for Raposa. (7/11/96 Tr. at 42.)

On the following Monday, November 6, Egbert faxed the polygraph examination results to Leavey. (7/11/96 Tr. at 45, 162.) Later that day, Lutes argued a motion to postpone jury impanelment in Raposa's case on the ground that his trial in New Bedford had not yet concluded. That motion was denied but counsel were advised that the trial would not begin until the New Bedford trial was completed. Impanelment took place on the following day and was conducted by attorney Vincent Indeglia. Egbert was present but did not participate. At that time, Egbert learned that the government had filed a last minute information, pursuant to 18 U.S.C. § 3559, the effect of which would have been to expose Raposa to a life sentence without parole, if convicted. Egbert conferred with Raposa and Indeglia about whether he should enter the case. Indeglia encouraged him to do so but Egbert "still wasn't ready to dive headlong into [the] case." (7/11/96 Tr. at 48.)

Some time after leaving the Courthouse on November 7, Egbert decided that he would seek to enter his appearance *pro hac vice* on behalf of Raposa. (7/11/96 Tr. at 50–51.) He then proceeded to cash Raposa's checks, (7/11/96 Tr. at 53), and, on November 9, faxed to the Court advance copies of a motion to be admitted *pro hac vice*, a motion to admit the polygraph evidence and a motion to dismiss the information. He also wrote to

Leavey inviting the government to have Raposa examined by an impartial polygraph examiner if Leavey agreed that the prior polygraph examination results could be admitted at trial if Raposa chose to testify. (Ex. P.)

At some point after Egbert decided to represent Raposa, he attempted, for the first time, to contact Lutes by calling Lutes' office. He was unable to reach Lutes but left a message. Egbert has no clear recollection regarding when that call was made but believes that it was on November 7. (7/11/96 Tr. at 51–52, 88–89.) Lutes returned Egbert's call on Thursday, November 9 and was informed that Egbert planned to enter the case. Lutes said that he was happy to have Egbert do so and offered to provide any assistance that he could. (7/11/96 Tr. at 52.) Prior to that conversation, Lutes had been told by a Court clerk that Egbert might be entering the case; but, during one of his meetings with Raposa while the New Bedford trial was in progress, Raposa denied that fact. (11/13/95 Tr. at 25.) In any event, Lutes was unaware that Raposa had been speaking with Egbert or that he had taken a polygraph test. (11/13/95 Tr. at 24–26, Ex. 3 [Lutes' affidavit] ¶ 10.) However, Lutes has stated that, had he known, he would not have objected. (Ex. 3, ¶ 10.)

On November 13, the date on which Raposa's trial was scheduled to begin, Egbert argued his motions. Since he had been forewarned that the government would object to his *pro hac vice* motion, he was accompanied by attorney Joseph Balliro who was fully prepared to represent Raposa in the event that Egbert's motion was denied.

After hearing argument, the trial judge denied Egbert's motion for admission *pro hac vice* on the ground that permitting Egbert to represent both Raposa and Ouimette would create a serious conflict of interest, especially since Ouimette had not yet been sentenced.

The trial judge then granted the motion to admit Balliro as *pro hac vice* counsel for Raposa after Balliro represented that he was familiar with the case having previously represented Raposa and having been thoroughly briefed by Egbert. The jury that previously had been impaneled was discharged and the case was rescheduled for trial in December. Raposa was found guilty.

On December 13, the trial judge conducted a hearing for the purpose of affording Egbert an opportunity to show cause why he should not be sanctioned for violating the Rules of Professional Conduct. Egbert's counsel argued that pursuant to D.R.I.Loc.R. 4(e)(1), such determination should be made by all of the active judges of the Court rather than by the trial judge alone. After considering that argument, the trial judge agreed and referred the matter to this panel which determined that there was good reason to believe that Egbert might have violated Rules 4.2 and 1.7 of the Rules of Professional Conduct.

## II. *Discussion*

Pursuant to Local Rule 4(d), this Court has adopted the Rules of Professional Conduct (RPC) as promulgated by the Rhode Island Supreme Court. *See* D.R.I.Loc.R. 4(d) (as amended Apr. 20, 1989). The RPC apply to any attorney who practices before this Court. Egbert is alleged to have violated Rule 4.2 (Communication with person represented by counsel) and Rule 1.7 (Conflict of Interest: General Rule).

At the hearing on this matter, Egbert testified and presented three witnesses on his behalf. In addition, he proffered several exhibits. The government presented no live witnesses. Its case was presented through the submission of four affidavits (Indeglia; Lutes; attorney Louis Robbio; and Raposa). After the hearing concluded, counsel for Egbert and the government filed post-hearing memoranda. Not surprisingly, Egbert argues that the evidence does not support a finding of a violation of either rule. The government concluded that Egbert's conduct did not violate Rule 1.7, but that his conduct does constitute a technical violation of Rule 4.2. The government recommends that the court impose no sanctions on Egbert since the technical violation of Rule 4.2 was not made in bad faith.

█  This court considers each alleged rule violation separately. We begin by noting

that our interpretation of each rule "as it applies to federal criminal law practice should be and is a matter of federal law." *Grievance Comm. for the S. Dist. of New York v. Simels,* 48 F.3d 640, 646 (2d Cir. 1995). We therefore make our analysis with this principle in mind.

▮ Rule 4.2 does not erect an absolute ban on communication with a represented person.[1] Although consisting of a single sentence, the rule contains several phrases which narrow its application significantly. The very first modifying phrase, "in representing a client," limits the "prohibition ... to attempts by the offending lawyer, *in representing his or her own client,* to drive wedges between other lawyers and clients." Charles W. Wolfram, *Modern Legal Ethics,* § 11.6.2 at 612 (pract. ed.1986) (emphasis added).

▮ The query for us then is whether Egbert's communications with Raposa were made in connection with his ongoing representation of Ouimette, or on behalf of Ouimette. *See, e.g., In re Mettler,* 305 Or. 12, 748 P.2d 1010, 1011–12 (1988). Egbert argues that there is no evidence that his communication with Raposa had anything to do with his representation of Ouimette. He cites to his own testimony on this point as well as that of Balliro and attorney John F. Cicilline. Our search of the record discloses no facts to support a finding that Egbert's communications with Raposa were made with a view toward advancing the interests of Ouimette. We note as significant that it was Raposa who approached Egbert for the purpose of retaining him, and that the conversations that ensued centered on that topic alone. While we might envision a scenario in which Egbert's efforts on Raposa's behalf might also have benefitted Ouimette, we decline to engage in such speculation here.

The record before us simply does not support such a conclusion. We find that Egbert's communications with Raposa were not made in connection with this representation of Ouimette and therefore, that his conduct does not violate Rule 4.2.

▮ We turn our attention next to the question of whether Egbert's conduct violated Rule 1.7. Rule 1.7 sets forth the general rule governing conflicts of interest. Subsection (a) prohibits representation of a client "if the representation of that client will be directly adverse to another client ..." R.I. Rules of Professional Conduct Rule 1.7.

We find that Egbert's representation of Raposa is not prohibited by Rule 1.7(a). The evidence presented is uncontroverted on this point. On all of the occasions when Egbert spoke to Raposa, (before, during and after Ouimette's trial) Raposa's story remained consistent and in concert with Ouimette's version of the facts.[2] Simply stated, according to Ouimette and Raposa, there had been no extortion. Since their positions were not at all antagonistic, Egbert reasonably concluded that his representation of Raposa would not have been directly adverse to his continuing representation of Ouimette.

▮ We next turn to the more thorny question of whether Egbert's representation of Raposa might have been materially limited by Egbert's continuing responsibilities to Ouimette. Rule 1.7(b) forbids such representation unless "(1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation." R.I. Rules of Professional Conduct Rule 1.7(b).

At the time that Raposa approached Egbert for representation, Egbert remained counsel of record for Ouimette. To complete his professional responsibilities to Oui-

---

1. Rule 4.2 of the RPC provides:
   **Communication with person represented by counsel.**—In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
   R.I. Rules of Professional Conduct Rule 4.2.

2. Egbert had interviewed Raposa as a potential witness before he was indicted. Later, during the pendency of the pre-trial proceedings, Egbert, Lutes and other defense counsel entered into a "joint defense agreement" whereby defense attorneys would communicate freely with each other's clients without first seeking express permission of counsel for the defendant to whom an attorney wished to speak.

mette, Egbert would represent him through sentencing. Ouimette was facing a sentence of life without parole pursuant to 18 U.S.C. § 3559. As Egbert explained at the hearing before us, because of the mandatory sentencing provisions of section 3559, the sentencing guidelines are effectively trumped, thereby removing any potential conflict between Ouimette and Raposa that might have been generated by litigation over guideline application. *Cf.* U.S.S.G. §§ 3B1.1 and 3B1.2. According to Egbert's uncontroverted testimony, he apprised both Ouimette and Raposa of his appraisal of the "remote" potential for conflict, and each consented to his taking on Raposa as a client.

We cannot say that Egbert's assessment of the potential for conflict here was unreasonable. On the basis of the evidence presented, we find no violation of Rule 1.7.

### III. *Conclusion*

Having determined that the respondent has shown cause, the matter is dismissed. SO ORDERED.

LAGUEUX, Chief Judge, concurs in the memorandum and decision of Judge Lisi.

TORRES, District Judge, concurring.

I agree that Egbert did not violate Rule 1.7 because he had a reasonable basis for believing that his responsibilities to Raposa and Ouimette would not adversely affect or materially limit his representation of the other; and, because the evidence indicates that he obtained the consent of both clients before undertaking to represent Raposa. However, it is my opinion that Egbert's interactions with Raposa, violated Rule 4.2.

In my view, the phrase "in representing a client" does not limit Rule 4.2's prohibition against communicating with a represented party to situations in which a lawyer is acting for the express purpose of advancing his client's interests. Rather, I read that phrase to mean that the prohibition as applying to communications with a represented party that occur *while* the lawyer is representing a client who has an interest in the matter discussed or *during* the course of that representation. It is difficult to imagine how an

attorney can set aside his representation of a client while communicating with a third party regarding a matter that is the subject of the representation.

Rule 4.2 serves several purposes. It "preserve[s] the integrity of the attorney-client relationship" and the attorney's ability to effectively represent the client without outside interference that may undermine that relationship. See, *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621, 625 (S.D.N.Y.1990); *see also* ABA Formal Ethics Op. 95–396 (1995); Charles W. Wolfram, *Modern Legal Ethics* § 11.6.2 n. 31 (1986). In addition, it protects a represented party from the dangers inherent in dealing directly with a trained lawyer who represents another party with respect to the same matter. *See* Lindquist, *supra,* at 267; Neals–Erik William Delker, Comment, *Ethics and the Federal Prosecutor: The Continuing Conflict over the Application of Model Rule 4.2 to Federal Attorneys,* 44 Am.U.L.Rev. 855, 861 (1995). For example, the rule "reduce[s] the likelihood that clients will disclose privileged or other information that might harm their interests," ABA Formal Ethics Op. 95–396 (1995), and prevents clients from committing imprudent acts that may operate to their disadvantage.

To make the applicability of Rule 4.2 contingent upon the motive of the other party's lawyer would undermine those purposes. The rule does not leave it to the judgment of the other party's lawyer to determine whether the communication will interfere with the attorney-client relationship or may result in some disadvantage to the represented party. Consequently, it is immaterial whether the other party's lawyer believes that his client's interests conflict with those of the represented party. Although the risk of disadvantage is greater when the communicating lawyer's client and the represented party have adverse interests, Rule 4.2 "prohibit[s] contact with *any* represented person, including those whose interests are apparently not adverse to the interests of an existing client of the lawyer." Wolfran, *supra,* § 11.6.2. (emphasis in the original).

In this case, it is clear that Egbert still was representing Ouimette when he commu-

nicated with Raposa. Those communications took place in November of 1995 and Ouimette was not sentenced until the following January. Furthermore, there is no question that the communications took place without Lutes' knowledge. Egbert, himself, candidly acknowledges that he did not even attempt to reach Lutes until at least November 7, several days after having twice talked with Raposa, persuading Raposa to submit to a polygraph examination, disclosing the results to Leavey and attempting to persuade Leavey to reevaluate the case.

I cannot accept the argument that, by subscribing to the "joint defense agreement," Lutes consented to those communications. A joint defense agreement permits a lawyer to talk to other defendants for the purpose of preparing a defense for the lawyer's client that is consistent with the positions taken by the other defendants. Since the relevant communications between Egbert and Raposa occurred after Ouimette's conviction, they could not have been for the purpose of preparing any defense common to Ouimette and Raposa. Indeed, Egbert, himself, apparently concedes that the joint defense agreement ended when Ouimette's trial concluded, (7/11/96 Tr. at 165), and describes those communications as discussions about prospective representation rather than discussions pursuant to the "joint defense agreement." (7/11/96 Tr. at 97–98.)

I also am unpersuaded by the argument that Rule 4.2 is inapplicable because Egbert was communicating with Raposa about possible representation. Rule 4.2 contains no such exception. I agree that a client is not irrevocably bound to his attorney and may discuss, with another lawyer, the possibility of changing counsel. However, the client's freedom to change attorneys does not relieve prospective replacement counsel of his ethical obligations. Since Egbert still was representing Ouimette, Rule 4.2 prohibited him from communicating with Raposa about the same matter.

In any event, Egbert's communications with Raposa went well beyond mere discussions about the *possibility* of representation. By persuading Raposa to submit to a polygraph examination, disclosing the results to Leavey and attempting to convince Leavey to reevaluate the case, Egbert, admittedly, engaged in acts amounting to *actual* representation of Raposa while Raposa still was represented by Lutes. (7/11/96 Tr. at 52.)

Finally, it is of no consequence that the discussions were initiated by Raposa. A lawyer has an obligation to abide by ethical strictures even though he may be requested to do otherwise. *See* ABA Formal Ethics Op. 95–396 (1995).

In short, in my judgment Egbert violated Rule 4.2. Nevertheless, I agree that no sanction is warranted because I am convinced that he acted out of a desire to help Raposa and Raposa's counsel agrees that the actions taken did not prove harmful to Raposa's interests.