**James PERRY and Dominque Yarbro, Plaintiff,**

v.

**CITY OF PONTIAC, a municipal corporation, Val Gross, Chief of Police Pontiac Police Department, Police Officer William Olsen and Police Officer Darryl Cosby, Defendant.**

No. 07–14036.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 8, 2008.

Diana L. McClain, Diana L. McClain and Assoc., Cyril C. Hall, Law Offices of Cyril C. Hall, P.C., Pontiac, MI, for Plaintiff.

Timothy S. Ferrand, Cummings, McClorey, Sterling Heights, MI, Eric S. Goldstein, Berry, Johnston, Troy, MI, for Defendant.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR PROTECTIVE ORDER

DAVID M. LAWSON, District Judge.

This 42 U.S.C. § 1983 excessive force case is before the Court on the defendants' motion for a protective order that would prevent plaintiffs' counsel from interviewing certain police officers from the Pontiac, Michigan police department. The defendants base their motion on a provision in the Michigan Rules of Professional Conduct that prevents attorneys from having conversations with the clients of another attorney without consent of that lawyer. Based on the positions of the potential interviewees within the police department and the proposed scope of the interview, the Court finds the interviewees will not fit within the definition of "a person ... represented by another lawyer" as that term is used within Mich. R. Prof. C. 4.2 or as understood in the context of the attorney-client privilege. Of course, other employees of the Pontiac Police Department may well fit within that definition, but the Court believes that the Michigan attorney disciplinary rules and the plaintiffs' counsel's professional judgment will deter expansion of the class of potential interviewees or the scope of the interviews, rendering a protective order unnecessary. Therefore, the motion for a protective order will be denied.

### I.

Although the merits of the case are not at issue in the present motion, it is necessary to review the plaintiffs' allegations to provide context to the informal discovery the plaintiffs seek.

According to the amended complaint, on October 12, 2006, the plaintiffs were inside a residence located at 66 Henderson Street in Pontiac, Michigan. Officers from the Pontiac Police Department (including defendants Olsen and Cosby; it is unclear if there were others) burst into the home. It is not clear whether the officers had a search warrant but the plaintiffs do not contend that the search itself was unlawful. Evidently, the officers suspected the residence to be a drug house of sorts, so they executed the raid aggressively. When the officers encountered the plaintiffs, the plaintiffs "followed every command, raising their hands and lying face down on the ground." Amend. Compl. at ¶ 12. After the plaintiffs were handcuffed and lying face down on the ground, officer Cosby and other unknown officers "kicked, punch[ed], and pepper sprayed the [p]laintiffs" for no apparent reason whatsoever. *Id.* at ¶ 13. Olsen and Cosby then slammed the plaintiffs against a wall and interrogated them without the benefit of *Miranda* warnings. Meanwhile, certain officers conducted a search of the residence, and they found a gun underneath the livingroom sofa. Olsen began to question the plaintiffs about the gun, but when neither plaintiff responded, Olsen threatened them by stating, "If you don't tell me who[se] gun this is I will tase you!" *Id.* at ¶ 19. The plaintiffs' refusal to capitulate proved costly. Olsen took a taser from another officer and proceeded to tase plaintiff Perry in the chest. Olsen then moved on to Yarbro, tasing him in the chest as well. The plaintiffs both fell and hit their heads. However, the officers did not take the plaintiffs to a hospital; they drove them directly to the police station and then to the Oakland County Jail.

As a result of Olsen's actions, he was immediately suspended and later fired. He was also charged with aggravated assault, which proceedings remain pending in the Michigan courts. Cosby, on the other hand, received no discipline, and Chief Gross "stopped the internal investigation regarding ... Cosby's actions." *Id.* at ¶ 27. According to the plaintiffs, the City of Pontiac "as a matter of practice, policy and custom, has, with deliberate indifference failed to sanction or discipline police officers, including the Defendants in this case, who concealed violations of the constitutional rights of citizens by other police officers, thereby causing and

encouraging police officers ... to engage in unlawful and unconstitutional conduct." *Id.* at ¶ 31. Further, the City "was deliberately indifferent to, and permitted and tolerated a pattern and practice of excessive and unreasonable beatings and uses of force by police officers ..., although such beatings and uses of force were improper, the officers involved were not prosecuted, disciplined or subjected to re-training." *Id.* at ¶ 32.

The plaintiffs filed their case in this Court on September 25, 2007. After the defendants answered the complaint, the Court held a status conference and entered an order limiting discovery and granting a stay of proceedings as to defendant Olsen. The Court agreed that the criminal proceedings against Olsen raised Fifth Amendment concerns, thus warranting a partial stay. Further, the Court limited discovery in general pending the next scheduling conference. That conference was held on April 8, 2008, after which the Court entered an order allowing for general discovery, although the stay with respect to Olsen remains intact.

The plaintiffs filed their amended complaint on March 25, 2008, and they now wish to interview certain employees of the Pontiac Police Department. Although the plaintiffs do not seek to conduct formal depositions, the defendants ask this Court to issue a protective order prohibiting the plaintiffs from conducting these interviews. In the defendants' view, the rules of professional conduct dictate this result.

## II.

■ Federal Rule of Civil Procedure 26 allows broad discovery in civil litigation, including "any nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). Discovery may be informal—by means of private investigation, witness interviews, and so forth—or it may employ the formal methods prescribed by the Federal Rules of Civil Procedure. *See Dorsey v. City of Detroit,* 858 F.2d 338, 341–42 (6th Cir.1988). But Rule 26's "desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plain-

tiff and defendant." *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 906 (6th Cir.1991).

■ Upon good cause shown, Federal Rule of Civil Procedure 26(c)(1) authorizes entry of protective orders "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." A court may fashion a protective order to limit discovery in a number of ways, including "forbidding the disclosure or discovery"; "specifying terms ... for the disclosure or discovery"; "prescribing a discovery method other than the one selected by the party seeking discovery"; and "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed.R.Civ.P. 26(c)(1)(A)-(D). District courts must use their sound discretion in deciding whether (and in what fashion) to issue protective orders. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 306 (6th Cir.2007).

■ The defendants contend that Michigan Rule of Professional Conduct 4.2 prohibits the plaintiffs' counsel from interviewing certain employees of the Pontiac Police Department. The defendants' request for a protective order is broadly worded. They seek "[a] Protective Order prohibiting any further contact between Plaintiffs' counsel and employees of the City of Pontiac." Defs.' Mot. at 10. However, based on the plaintiffs' brief, it appears that the potential interviewees are rank-and-file police officers, not persons in supervisory positions.

Rule 4.2, made applicable to attorneys practicing in this Court by way of Local Rule 83.20(j), provides as follows:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Mich. R. Prof. C. 4.2; *see also* E.D. Mich. LR 83.20(j); E.D. Mich. LR 83.22(b); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Alticor, Inc.,* 472 F.3d 436, 438 (6th Cir.2007) (applying the Michigan Rule of Professional

Conduct to regulate the conduct of attorneys in federal courts).

The application of Rule 4.2 is straightforward when the client of the other lawyer is an individual. In keeping with the ABA Rules, Rule 4.2 prohibits a lawyer from communicating about the subject of the representation with a party whom the lawyer knows to be represented by another lawyer in connection with the same case. When the client is an organization comprised of several individuals with differing duties and levels of responsibility, however, defining the reach of this rule is not so simple.

The official comment to Rule 4.2 indicates that an employee of an organization can be considered a person "represented by another lawyer in the matter" when he or she is a "person[ ] having a managerial responsibility" and "any other person whose act or omission in connection with the matter may be imputed to the organization ... or whose statement may constitute an admission on the part of the organization." Cmt. 7 to Mich. R. Prof. C. 4.2

The import of the Commentary, therefore, suggests that Rule 4.2 incorporates the definition of "client" formulated by the Supreme Court in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), and cases following in its wake. In *Upjohn*, the Court redefined the concept of who is the client within the attorney-client relationship (and therefore whose communications are protected by the attorney-client privilege) in the case of a corporate party. Before *Upjohn*, courts often had applied the "control-group test." Although recognizing that the corporate entity was the client for the purpose of the attorney-client privilege, that test dictated that communications between senior-level officers and corporate counsel were privileged on the rationale that they "possess an identity analogous to the corporation as a whole." *Upjohn*, 449 U.S. at 390, 101 S.Ct. 677 (internal quotes omitted). The *Upjohn* Court rejected the control-group test, concluding that it "overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Ibid.* The bilateral aspect of the privilege can create problems in the context of a corporate client that do not arise in the case of an individual. As the Court explained:

> In the case of the individual client the provider of information and the person who acts on the lawyer's advice are one and the same. In the corporate context, however, it will frequently be employees beyond the control group as defined by the court below—"officers and agents ... responsible for directing [the company's] actions in response to legal advice"—who will possess the information needed by the corporation's lawyers. Middle-level—and indeed lower-level—employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.

*Id.* at 391, 101 S.Ct. 677. With this idea in mind, the Court held that when a corporation's managers require its employees to give information to its attorneys in the course of providing legal advice, those communications also are protected. *Id.* at 396, 101 S.Ct. 677. The *Upjohn* Court therefore advised against a mechanical approach to determining the scope of the privilege, although it simultaneously stressed the need for a strong measure of predictability. *See id.* at 393, 101 S.Ct. 677 ("[I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected.").

Because the attorney-client privilege only inheres in a represented party, *Upjohn* and its progeny provide a useful framework to determine the reach of professional rules that define the duties of confidentiality by a lawyer toward a "client" and limit the contacts by one lawyer with the "client" of another. That is, *Upjohn* speaks to who qualifies as a represented party when the actual client is a corporation. Although *Upjohn* specifically dealt with private corporations, the Sixth Circuit has extended its rationale

to municipal corporations as well. *See Ross v. City of Memphis,* 423 F.3d 596, 602 (6th Cir.2005) (reasoning that since one purpose of the attorney-client privilege is to encourage uninhibited disclosure between attorney and client, there is "no reason that that function is no longer served simply because the corporation is a municipality or, more broadly, that the organization or agency is a government entity").

The defendants argue that the proposed interviewees fit Rule 4.2's definition of "represented person" as informed by the *Upjohn* line of cases, and they cite *Massa v. Eaton Corp.,* 109 F.R.D. 312 (W.D.Mich.1985), and *Lorillard Tobacco Co. v. Kamposh, LLC,* No. 05–71324, 2006 WL 3497311 (E.D.Mich. Dec.1, 2006), to support their position that the proposed interviews are impermissible. *Massa* is easily distinguished from the situation at hand. In that case, one of the plaintiffs in an age discrimination suit against his former employer conducted *ex parte* interviews of several *managerial*-level employees regarding the subject matter of the litigation. Although the interviews were conducted by the plaintiff himself, this conduct received counsel's blessing. The court held this to be in violation of Michigan's Rules of Professional Conduct. Even though Rule 4.2 was not yet in place, the court observed that things had changed since *Upjohn,* and it was only reasonable to interpret the then-applicable rule in accordance with that decision.

*Lorillard Tobacco* differs significantly from Massa in that it did not involve communications with managerial-level employees. In *Lorillard Tobacco,* Lorillard sued Kamposh, LLC alleging that the latter had distributed counterfeit cigarettes bearing the former's brand. The plaintiff also alleged that defense counsel made improper contact with one of the plaintiff's sales representatives, questioning her about matters related to the lawsuit without permission by the plaintiff or its counsel. Because the facts were ambiguous, the court did not determine that defense counsel actually made this contact. However, the court did find that the sales representative "is an individual who may fall within the definition of 'a party whom the lawyer knows is represented'"

within the meaning of Rule 4.2. 2006 WL 3497311 at *4. Therefore, the court entered a protective order "precluding any ex parte contact with Lorillard employees." *Id.* at *3.

For their part, the plaintiffs have asked the Court to consider *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621 (S.D.N.Y.1990), and *McCallum v. CSX Transportation, Inc.,* 149 F.R.D. 104 (M.D.N.C.1993). The court in *Polycast* denied a motion for a protective order wherein attorneys for Uniroyal sought to preclude counsel for Polycast from having *ex parte* communications with the former director of one of Uniroyal's divisions, a man who reported to Uniroyal's vice president, also a named defendant in the case. *See id.* at 622–23. At first blush, the court's decision would seem to support the plaintiff's narrow interpretation of Rule 4.2. However, *Polycast* is inapposite because it involved a *former* employee, and the court drew heavily on that circumstance. *See id.* at 625–28.

In *McCallum,* the court actually granted the defendant's motion for a protective order prohibiting *ex parte* contacts with certain railroad employees who had knowledge of the accident that gave rise to the plaintiffs' negligence case (e.g., the brakeman). Nevertheless, the court observed that the prohibition on *ex parte* contacts is not as broad as it might seem, and it is this discussion on which the plaintiffs would have the Court focus. In making this observation, the *McCallum* court provides useful guidance for determining when a lower-level employee of an organization may be contacted by an opposing lawyer. Observing that the rule restricts contacts with employees "whose statement may constitute an admission on the part of the organization," *McCallum,* 149 F.R.D. at 109, the court emphasized the relationship between North Carolina's professional ethics rule (identical to Michigan's) and Federal Rule of Evidence 801(d)(2)(D), dealing with party admissions. Rule 801(d)(2)(D) governs when an employee's statement may operate as an admission by the employer, and provides that this is so in the case of "a statement by the party's agent or servant concerning a matter within the scope of the agency or employ-

ment, made during the existence of the relationship."

The *McCallum* court noted that although the Rules of Evidence allow an employee's statement to constitute an admission of the employer without proof of specific authority to speak on the employer's behalf, "the statement still must be within the scope of the agency or employment of the employee." *McCallum,* 149 F.R.D. at 111 (citing 12 Michael H. Graham, Federal Practice and Procedure § 6722, p. 508 (Interim Ed.1992)). Certainly lower-level employees can make admissions that bind their employer, but not "unless their job function has something to do with the issue at hand." *Ibid.* The court applied these principles to the professional ethics rule (Rule 4.2's analog), reasoning as follows:

> Turning to the concerns of the instant case, if the employee is somehow involved in a matter which is the subject of dispute between the parties, the employee's statements may constitute an employer admission and an attorney should not interview the employee without permission. This may even include employees who have not been directly involved in the decision, but are involved in similar decisions. For example, if a truck driver is involved in the accident, he can bind the employer by making statements about his driving actions or instructions given him. 12 Graham, *supra.* He should not be contacted without the corporation's counsel being present. The same rule would apply, for example, to the driver's training instructor, if that were an issue in the case.

> On the other hand, some employees may have witnessed the accident. Those who merely observed may be interviewed as to those matters without constituting employer admissions. *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. at 628; *Frey v. Dep['t] of Health and Human Serv[s.],* 106 F.R.D. 32, 37 n. 2 (E.D.N.Y.1985). Their statements would be important fact information, but would not be employer admissions. In conclusion, the ethical rule concerning contact with an opponent's employees during litigation imposes burdens and requires counsel to proceed with ex-

treme caution if *ex parte* interviews are attempted. But it does not stretch too far by covering employees who make Fed. R.Evid. 801(d)(2)(D) admissions.

*Ibid.*

The lessons *McCallum* teaches are that the determination whether employees of a party may be contacted by opposing counsel turns on whether their statements or conduct can be attributed to the employer itself, and the Federal Rules of Evidence in general, and Rule 801(d)(2)(D) in particular, furnish a principled method by which to resolve that question. A statement by an employee of an organization can bind the employer vicariously only if the opposite party can establish the necessary foundation.

A sufficient foundation to support the introduction of vicarious admissions therefore requires only that a party establish (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency. *See, e.g., United States v. Pilarinos,* 864 F.2d 253, 257 (2d Cir.1988); *Davis v. Mobil Oil Exploration & Producing Southeast, Inc.,* 864 F.2d 1171, 1173–74 (5th Cir.1989); *Northern Pacific Ry. v. Herman,* 478 F.2d 1167, 1171 (9th Cir. 1973). The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate. *See* J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(D) [01] (1991).

*Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 537–538 (2d Cir.1992).

The Sixth Circuit tends to take a narrow view of the scope of an employee's agency, even when the employee occupies a managerial position. For instance, in *Jacklyn v. Schering–Plough Healthcare Products Sales Corp.,* 176 F.3d 921 (6th Cir.1999), an employment discrimination case, the plaintiff sought to offer the statement of her former supervisor, a district manager, as an admission of the defendant-employer. The court rejected the evidence because the manager did not supervise the plaintiff at the time of her separation and did not conduct any of

her performance reviews at that time. The court concluded that the "[p]laintiff failed to show that [the manager]'s statement concerned matter within the scope of his agency or employment." *Id.* at 927–928.

Similarly, in *Hill v. Spiegel, Inc.,* 708 F.2d 233 (6th Cir.1983), the plaintiff, who sued for age discrimination, sought to introduce the testimony of a subordinate that "three other managers told him that the plaintiff was discharged because of his age." *Id.* at 236. The court acknowledged that under Rule 801(d)(2)(D), for an employee's statement to be received as an admission of the employer, "it is not necessary to show that the declarant had authority to make the statement. But it is necessary, we repeat, to show, to support admissibility, that the content of the declarant's statement concerned a matter within the scope of his agency." *Id.* at 237. The court observed that although the three employees held managerial positions, they were not involved in any decisions regarding Hill, the plaintiff. The court held:

> The mere fact that each of these men was a "manager" within the expansive Spiegel organization is clearly insufficient to establish that matters bearing upon Hill's discharge were within the scope of their employment. Their statements to Baker concerning Hill's discharge cannot, on this record, be considered as vicarious admissions by Spiegel. *Cf. Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 80–81 … n. 3 (2d Cir.1980), *cert. denied,* 454 U.S. 1083[, 102 S.Ct. 639, 70 L.Ed.2d 618] (1981); see also Notes of Advisory Committee on Proposed Rules, Fed.R.Evid. 801. We conclude that the admission of this evidence on this record was reversible error.

*Ibid.*

In light of this authority, the Court finds it unlikely that the proposed interviewees can be considered "person[s] … represented by another lawyer" within the meaning of Michigan Rule of Professional Conduct 4.2. The interviewees are not managerial-level employees or persons whose acts or omissions in connection with the present matter may be imputed to the organization, and the topics of inquiry are unlikely to lead to statements that may constitute admissions on the part of the City of Pontiac.

It is clear at this point that the plaintiffs wish to speak only with rank-and-file police officers, so the first category of prohibited contact under Rule 4.2—communications with managerial-level employees—is not implicated. The question then becomes whether acts or omissions by these officers could be imputed to the municipality or their statements could amount to admissions by the City. Plaintiffs' counsel states that she wants to question Pontiac police officers about (1) "retaliation for complaints made about police officers by police officers," and (2) the " 'golden boy' reputation of [d]efendant Daryl Cosby." Pls.' Response to Mot. at 5. If those police officers inform counsel of their own acts or omissions, it is unlikely that they will relate to the subject matter of the case. For instance, if counsel questions a police officer whether he or she has seen or been subject to retaliation for complaining about another police officer, *his or her* acts or omissions would not be the subject of discussion. Similarly, police officers' views of the reputation of Daryl Cosby simply do not qualify as acts or omissions; certainly their opinions of Cosby's reputation could not be imputed to the City of Pontiac.

Nor are the interviews likely to generate statements that amount to admissions by the City. The plaintiffs ultimately hope to prove that the City of Pontiac has a practice, custom, or policy of allowing officers to beat suspects with impunity. But officer discipline, or the lack thereof, is not something that falls within the scope of employment or agency of rank-and-file police officers. It would be different, of course, if plaintiffs' counsel sought to interview the chief, the manager of human resources, or perhaps even a sergeant. Matters of officer discipline would fall within the scope of their employment, and their statements could serve as admissions by the City. On the other hand, rank-and-file officers' statements of their observations and impressions of discipline at the City of Pontiac Police Department "would be important fact information, but would not be employer admissions." *See McCallum,* 149 F.R.D. at 111. The same

goes for their impressions of Cosby's reputation.

The Court finds, therefore, that the proposed interviews will not offend MRPC 4.2.

The defendants also make reference to a potential violation of Michigan Rule of Professional Conduct 1.6, which prevents an attorney from disclosing confidential communications of clients and potential clients. Reliance on that rule is misplaced, however, because the plaintiffs' attorney does not purport to be using these interviews to recruit the interviewees as clients or otherwise establish an attorney-client relationship with them. Rule 1.6 has no application to the present dispute.

### III.

The Court concludes that the potential interviewees will not fall within the range of represented persons of an organization, based on their position within the organization and the scope of the interviews as represented by the plaintiffs' counsel. Of course, if the interview touches on other matters dealing with the transactions in this case, or there is an attempt to interview the supervisors of the individual defendants, a violation of Michigan Rule of Professional Conduct 4.2 may occur. However, based on the representation of the plaintiffs' counsel as to the limitations on the interviews, the Court does not believe a protective order is necessary.

Accordingly, it is **ORDERED** that the defendants' motion for a protective order [dkt. # 13] is **DENIED.**